CHARLES FRANCIS ADAMS ET AL., peticionarios, *v.* TRIBUNAL DE CONTRIBUCIONES DE PUERTO RICO, demandado; TESORERO DE PUERTO RICO, interventor.

Número 282.

*Sometido:* 1 de octubre de 1952. *Resuelto:* 29 de octubre de 1952.

---

20

*Charles R. Hartzell, Rafael O. Fernández, José L. Novas,* abogados de los peticionarios; *Hon. Procurador General Víctor Gutiérrez Franqui* y *Arnaldo P. Cabrera, Procurador General Auxiliar,* abogados del interventor, querellado en el pleito principal.

EL JUEZ ASOCIADO SEÑOR ORTIZ emitió la opinión del tribunal.

Se hace preciso determinar en este caso si la exención contributiva establecida en la sección 16–B de la Ley de Rentas Internas de Puerto Rico es aplicable a cierta maquinaria importada e introducida en Puerto Rico por los peticionarios que se alega hacen negocios como fiduciarios bajo la designación común "Central Aguirre Sugar Company (*a trust*)" El anterior Tribunal de Contribuciones de Puerto Rico resolvió que tal exención no ampara la maquinaria envuelta en este caso y dictó sentencia declarando no haber lugar a la devolución de arbitrios solicitada por los peticionarios. En sus conclusiones en torno a los hechos el tribunal recurrido estableció que la maquinaria objeto de esta acción fué introducida en Puerto Rico durante el período compren-

dido entre abril 4 de 1948 y junio 27 de 1950, y que los arbitrios en la cantidad de $16,862.70 fueron pagados en 28 de junio de 1950.

En sus conclusiones de hecho el Tribunal de Contribuciones dijo lo siguiente:

"Según la evidencia aportada y de acuerdo con lo que el Tribunal observó en una inspección ocular que hizo, la maquinaria cuyos arbitrios son objeto de esta controversia se utiliza por la demandante en su sistema de almacenado y embarque de azúcar a granel. Se trata de una serie de conductores y elevadores mecánicos que transportan el azúcar crudo de las centrífugas a una balanza donde es pesada y de aquí, moviéndose a una velocidad de dos a trescientos pies por minuto, la conducen a varios almacenes de la demandante a una distancia el más lejos de ellos, de unos novecientos pies del sitio donde están las centrífugas. Uno de estos almacenes, el único a través del cual el azúcar se despacha, está construído de tal forma que los vagones del ferrocarril le pasan por debajo y el azúcar por gravedad cae dentro de unas cubetas de hierro colocadas sobre la plataforma de dichos vagones. El producto es así transportado por tren hasta el muelle donde el barco con su maquinaria eleva las cubetas y vierte el azúcar en sus bodegas. El producto que no va directamente a este almacén de embarque es llevado por los conductores y demás elevadores fijos a varios almacenes donde por medio de un lanzador portátil el azúcar es almacenada a granel y ahí permanece. Por medio de los mismos aparatos y maquinaria pero moviéndose entonces en dirección inversa, el azúcar es sacado de esos almacenes y conducido al almacén de descarga y de ahí a los vagones del ferrocarril y al barco. Esto son los mismos almacenes que la demandante utilizaba para guardar el azúcar en sacos hasta que llegara el momento de ser embarcado, cuando no había adoptado el sistema de embarque a granel."

De acuerdo con la prueba presentada en el tribunal a quo, el uso de tal maquinaria sustituyó el anterior sistema de colocación del azúcar en sacos.

■ Antes de ser enmendada por la Ley núm. 436 de 14 de mayo de 1947 ((1) pág. 909), la sección 16–B de la Ley de Rentas Internas disponía, en lo pertinente, lo siguiente:

"Estarán exentos del pago de los arbitrios impuestos por esta Ley toda maquinaria, aparato o equipo que sea esencial para el establecimiento y funcionamiento de plantas industriales. ..."

El 14 de mayo de 1947 se aprobó por la Asamblea Legislativa de Puerto Rico la Ley núm. 436, que es aplicable a gran parte de la maquinaria introducida por los peticionarios.[1] Esa Ley núm. 436 enmendó la sección 16–B en la siguiente forma:

"Estará exento del pago de los arbitrios impuestos por esta Ley todo aparato, maquinaria o equipo que sea esencial para el establecimiento y funcionamiento de plantas industriales; *Disponiéndose,* que se considerarán comprendidas en esta exención las subunidades o fases principales *(major features)* de dichos aparatos, equipo o maquinarias, que sean necesarias para reponer otras subunidades o para ampliar o mejorar el equipo, pero no estarán incluídos las partes, piezas o accesorios de la maquinaria o de la subunidad cuyo 'costo en Puerto Rico' por unidad individual sea menor de veinte (20) dólares; *Disponiéndose, asimismo,* que por subunidad o fase principal *(major feature)* se entenderá aquellas secciones, partes o accesorios sustanciales de la maquinaria o equipo esencial; *Disponiéndose, finalmente,* que por ser ésta una exención que ampara la maquinaria esencial para el establecimiento y funcionamiento de plantas industriales, deberá entenderse aplicable sólo a la maquinaria de la fase fabril productiva del proceso industrial que intervenga con las materias primas desde el comienzo del proceso de manufactura hasta su terminación, incluyendo envase y rotulación del producto; pero no amparará la maquinaria, aparatos, equipo, ni vehículos empleados en la fase administrativa o comercial de la industria; *Disponiéndose, sin embargo,* que se considerará amparado por la exención cualquiera maquinaria o equipo que se instale en la planta manufacturera con fines de salubridad de operarios o de prevención de accidentes."

---

[1] Como veremos más adelante, la sección 16–B fué enmendada por la Ley núm. 195 aprobada el 7 de mayo de 1949 ((1) pág. 615). Hasta esa fecha los peticionarios habían importado 21 unidades de un total de 29 que fueron introducidas como parte de la maquinaria objeto de este caso. Esas 21 unidades pagarían en concepto de arbitrios un total de $15,872.63, y las restantes unidades introducidas después del 7 de mayo de 1949 pagarían en tal concepto un total de $990.07.

El 7 de mayo de 1949 se aprobó la Ley núm. 195 que enmendó de nuevo la sección 16–B en la siguiente forma:

"Estará exento del pago de los arbitrios impuestos por esta Ley todo aparato, maquinaria o equipo que sea esencial para el establecimiento y funcionamiento de plantas industriales; *Disponiéndose,* que se considerarán comprendidas en esta exención las subunidades o fases principales *(major features)* de dichos aparatos, equipo o maquinaria, que sean necesarias para reponer otras subunidades o para ampliar o mejorar el equipo, pero no estarán incluídas las subunidades ni las partes, piezas o accesorios de la maquinaria o de la subunidad cuyo 'costo en Puerto Rico' por unidad individual sea menor de veinte (20) dólares.

"*Disponiéndose, finalmente, asimismo,* que por ser ésta una exención que ampara la maquinaria esencial para el establecimiento de plantas industriales, deberá entenderse aplicable sólo a la maquinaria de la fase fabril productiva del proceso industrial que intervenga con las materias primas desde el comienzo del proceso de manufactura hasta su terminación, pero incluyendo además la maquinaria, camiones o montacargas *(hoisting units)* que se utilicen exclusiva y permanentemente en la conducción de materia prima y artículos semi-elaborados dentro del circuito *(premises)* de la planta industrial así como el equipo que se emplee en el envase, rotulación del producto y en la preservación de éste o de la materia prima en caso de artículos perecederos; pero no amparará la maquinaria, aparatos, equipo, ni vehículos empleados en la fase administrativa, distributiva o comercial de la industria.

"*Disponiéndose, sin embargo,* que se considerará igualmente amparado por la exención cualquiera maquinaria o equipo que se instale en la planta manufacturera con fines de salubridad de operarios o de prevención de accidentes, así como la maquinaria o equipo que se use en la operación y el funcionamiento de laboratorios de carácter experimental, funcionen éstos o no como partes de plantas industriales, así como también el equipo que se use en la fase preliminar exploratoria de regiones *(reconnaissance)* con miras a su desarrollo mineralógico."

Fué el propósito de las enmiendas de 1947 y 1949 el restringir la exención establecida por la Ley núm. 77 de 9 de mayo de 1944 (pág. 167) a los fines de que los aparatos, maquinarias o equipos mencionados en tal sección 16–B se uti-

lizaran en la fase fabril de la industria, o sea, que tal maquinaria o equipo no solamente fuese esencial para el establecimiento o funcionamiento de plantas industriales, sino que también se utilizasen en la fase fabril productiva del proceso industrial que intervenga con las materias primas desde el comienzo del proceso de manufactura hasta su terminación. *Descartes, Tes.* v. *Tribl. Contribuciones y Sucn. Serrallés,* 71 D.P.R. 471, 478, 479.

El problema esencial en este caso consiste en determinar si la maquinaria ya descrita es parte de la fase fabril de la Central Aguirre e interviene con las materias primas desde el comienzo del proceso de manufactura hasta su terminación o si, por el contrario, es usada en la fase administrativa o comercial de la industria. En primer término, la exención contributiva que estamos discutiendo debe ser interpretada restrictivamente. *Descartes, Tes.* v. *Tribl. Contribuciones y Sucn. Serrallés,* supra; *Descartes, Tes.* v. *Tribl. Contribuciones y Cervecería India,* 71 D.P.R. 512, 516; *Sucn. Serrallés* v. *Tribunal de Contribuciones,* 73 D.P.R. 35, 38. La intención de crear exenciones contributivas debe ser manifestada claramente—*Smith* v. *Davis,* 323 U. S. 111—y de haber dudas razonables que tengan una base adecuada en cuanto a si el estatuto concede o no una exención en determinado caso, esas dudas deben resolverse en contra de la existencia de la exención. *Phoenix Insurance Co.* v. *Tennessee,* 161 U. S. 174; *Covington &c. Turnpike Co.* v. *Sandford,* 164 U. S. 578. Las exenciones contributivas no deben ser ampliadas mediante inferencias o deducciones si las dudas en cuanto a su existencia están debidamente balanceadas. *Trotter* v. *Tennessee,* 290 U. S. 354, 356. Sin embargo, el estatuto creador de una exención no debe ser leído ni interpretado tan restrictivamente o con tal aversión que pueda quedar destruído el verdadero propósito del legislador. *Trotter* v. *Tennessee,* supra.

Después de establecer la regla general al efecto de que una exención contributiva debe interpretarse restrictiva-

mente, que en caso de dudas razonables debe denegarse la exención y que el peso de la prueba para establecer la exención recae sobre el contribuyente, en 51 Am. Jur. 531, sección 528, se indica lo siguiente:

"La regla básica de interpretación de estatutos—el comprobar y declarar la intención de la legislatura y el darle efectividad a tal intención—es aplicable a la interpretación de disposiciones estatutarias que concedan exenciones contributivas. Aunque la intención de eximir una propiedad de contribución debe ser determinada a base del lenguaje usado en el propio estatuto, el cual debe ser interpretado estrictamente en contra de la exención de contribución, sin embargo, si por los términos de un estatuto se concede una exención contributiva, el mandato estatutario debe merecer tanta obediencia como uno que imponga una contribución. Al lenguaje usado debe dársele su significado ordinario y no su significado técnico. La regla de interpretación estricta, en ausencia de ambigüedad, no requiere lo contrario de lo ya expuesto, ni significa que las cortes deben ser cohibidas de investigar y comprobar, si es posible, el verdadero significado del lenguaje que se usa en un estatuto que conceda una exención contributiva.

"Un lenguaje estatutario que se refiere a una exención contributiva de bienes debe merecer una interpretación justa y razonable que no sea demasiado amplia ni demasiado estrecha, a los fines de comprobar la verdadera intención legislativa en cuanto a la extensión de tal lenguaje, y una vez aplicado, la interpretación debe ser estrictamente aplicada y llevada a cabo en tal forma que los límites así definidos no sean indebidamente ampliados o extendidos. Con toda seguridad, la regla de interpretación estricta no exige una interpretación forzada que sea antagónica a la verdadera intención de la legislatura, ni una tan estrecha ni tan restringida que derrote el aparente propósito legislativo. Es el deber de la corte el comprobar y llevar a cabo la intención de la legislatura. La regla de interpretación estricta no prohibe una interpretación liberal del lenguaje usado a los fines de efectuar la intención especificada por los legisladores, aunque eso significa que la propiedad que se alega está exenta debe estar cubierta claramente por la disposición que concede tal exención. Las exenciones contributivas no son interpretadas en el sentido de incluir cosas que no caen justamente dentro del significado de la palabra del estatuto. La enumera-

ción en el estatuto de algunas cosas específicas que pueden ser eximidas excluye todas las otras cosas que no se mencionan en el estatuto..."

Refiriéndose específicamente a exenciones contributivas concedidas a compañías que se dedican a la manufactura o fabricación de productos, en las anotaciones contenidas en 10 A.L.R. 1273 y 116 A.L.R. 1111, se señala que la regla general es al efecto de que las disposiciones estatutarias que establecen exenciones a fabricantes o manufactureros, al igual que otras exenciones que conceden privilegios específicos, deben ser consideradas en contra de los que invocan la exención, pero también se señala que las palabras usadas en tales estatutos deben ser consideradas en su significado ordinario y práctico y no en su significado técnico, y que las cortes deben darle debida consideración a la intención legislativa, no debiéndose adoptar interpretación alguna que implique una violación de los propósitos legislativos.

██ Aplicando tales normas de hermenéutica a las circunstancias de este caso, no solamente hay un margen adecuado para que puedan existir dudas razonables en cuanto a la exención de la maquinaria aquí envuelta, quedando así derrotada la exención, sino que de los propios términos de la ya mencionada sección 16–B, según quedó enmendada por la Ley núm. 436 de 14 de mayo de 1947 y por la núm. 195 de 7 de mayo de 1949, surge el hecho de que la exención estatutaria no es aplicable a la maquinaria en discusión. Al colocarse el azúcar en los conductores y elevadores mecánicos, ya el azúcar estaba terminada, desde el punto de vista fabril. El funcionamiento de ese equipo no es esencial al proceso industrial en sí ni es parte integrante de la fase fabril productiva a que se refiere el estatuto. Los conductores y elevadores mecánicos no sirven de ayuda a la producción del azúcar, y más bien su funcionamiento se limita al proceso de transportación de azúcar ya producida. Bajo la propia ley

vigente al introducirse en Puerto Rico esa maquinaria, la exención no se extiende a maquinaria utilizada en la fase comercial de la industria. La maquinaria objeto de este litigio sirve de punto de enlace o de frontera entre la fase industrial y el proceso de venta del azúcar, pero no tiene función alguna en la etapa final de la terminación fabril del artículo a que se refiere el estatuto. Estaría más lógicamente catalogada en la etapa inicial de la fase comercial.

De otro lado, al disponer la sección 16–B que la fase fabril productiva del proceso industrial incluye el envase y rotulación del producto, tal disposición no es aplicable a la maquinaria envuelta en el caso de autos.

Bajo la enmienda a la sección 16–B aprobada en virtud de la Ley núm. 195 de 1949, está exenta la maquinaria que se usa en la preservación del producto. Tal concepto no es aplicable a la maquinaria en discusión, ya que debe limitarse el término "preservación" al proceso que sea necesario para que no se dañe el producto. *Habitch, Braun & Co.* v. *United States*, 175 Fed. 1009, 1012.

Los peticionarios no han sostenido adecuadamente el peso de la prueba que sobre ellos recaía de demostrar la existencia de una exención. Tampoco han demostrado que la intención o el propósito legislativo haya sido, claramente, el de conceder una exención a maquinaria como la usada en el caso de autos. El no reconocer la exención no destruye ni implica aversión al propósito legislativo. Por el contrario, la historia legislativa de la sección 16–B exhibe el propósito de restringir la exención. *Descartes, Tes.* v. *Tribl. Contribuciones y Sucn. Serrallés*, supra. Ya hemos visto que tal como regía la sección 16–B antes de su enmienda en el año 1947, cualquier equipo o maquinaria que fuese esencial para el funcionamiento de plantas industriales caía bajo la exención. Pero bajo la Ley núm. 436·de 1947 se limitó el concepto de "esencialidad" a lo que estuviese cubierto, estrictamente, en el proceso industrial que intervenga con las

materias primas desde el comienzo del proceso de manufactura hasta su terminación.(²)

En el caso de *Burke* v. *Stitzel-Weller Distillery*, 145 S.W. 2d 861, se resuelve que bajo un estatuto que establece una exención contributiva de maquinaria perteneciente a corporaciones que se dedican a la manufactura o fabricación de productos, la palabra "manufactura" varía de acuerdo con las circunstancias y no es susceptible de una definición que sea demasiado abarcadora o exclusiva, pero la palabra debe ser definida como indicativa del proceso mediante el cual las materias primas se convierten en un artículo que finalmente quede en forma adecuada para ser usado, y como regla general, ningún artículo ha sido manufacturado hasta que haya sido puesto en condiciones para ser vendido en el mercado abierto, a los fines del uso propio del artículo. Se indica que hasta tanto el artículo esté terminado y listo para su uso final, o hasta tanto esté tan completo que en el curso ordinario del negocio específico de la compañía esté listo para ser puesto en el mercado abierto para su venta, la maquinaria que produce ese artículo, hasta ese punto, debe quedar sujeta a la exención contributiva. En dicho caso se resolvió que la maquinaria usada para embotellar o envasar un licor es parte del proceso de manufactura y debe quedar sujeta a la exención contributiva aplicable a maquinaria que se usa en el curso de la manufactura de productos. Sin em-

---

(²) Debido a esa enmienda es que no son aplicables al de autos los casos resueltos por este Tribunal al amparo de la sección 16–B tal como regía desde el 1944 (Ley núm. 77 de 1944) hasta el 14 de mayo de 1947. Véanse *Caparra Dairy* v. *Tribl. de Contribuciones*, 67 D.P.R. 314; *Buscaglia, Tes.* v. *Tribl. de Contribuciones*, 67 D.P.R. 57; *Descartes, Tes.* v. *Tribl. de Contribuciones y Sucn. Serrallés*, 71 D.P.R. 471. El nuevo criterio restrictivo encarnado en la Ley núm. 436 de 1947 se refleja en los casos posteriores donde se denegó la exención, aunque esos casos envolvían hechos distintos a los que concurren en el de autos. Véanse *Descartes, Tes.* v. *Tribl. Contribuciones y Cervecería India*, 71 D.P.R. 512; *Central Coloso* v. *Tribl. Contribuciones*, 70 D.P.R. 65; *Sucn. Serrallés* v. *Tribunal de Contribuciones*, 73 D.P.R. 35, 38. En *Cervecería India, Inc.* v. *Tribl. Contribuciones*, 71 D.P.R. 496, se concedió la exención, bajo la ya citada Ley del 1947, pero se trataba de equipo eléctrico usado para alumbar y mover la fase fabril productiva del proceso de elaboración de cerveza.

bargo, el estatuto de Kentucky que concedía la exención contributiva es más amplio que la sección 16–B de nuestra Ley de Rentas Internas aplicable a este caso, ya que la Ley de Kentucky se refiere a maquinaria que se usa en el proceso de manufactura, mientras que dicha sección 16–B dispone, en parte, que la exención deberá entenderse sólo aplicable a la maquinaria en la fase fabril productiva del proceso industrial que intervenga con las materias primas desde el comienzo del proceso de manufactura hasta su terminación

No es aplicable al de autos el último caso citado.    La ley de Kentucky es distinta a la nuestra y es hasta más amplia que nuestra Ley núm. 77 de 1944, el alcance de la cual, como hemos visto, fué posteriormente restringido.    Además, en el caso de *Burke* se trataba de envase de licor, lo cual es distinto a un conductor de azúcar ya terminada.    Incidentalmente, véase la anotación en 172 A.L.R. 313, en cuanto a exención contributiva de maquinaria.

*Debe confirmarse la sentencia dictada por el antiguo Tribunal de Contribuciones.*

Los Jueces Presidente Sr. Todd, Jr., y Asociado Sr. Sifre no intervinieron.