TEXTILE DYE WORKS, INC. y GENERAL PROCESSORS, INC., demandantes y recurrentes, *v.* SECRETARIO DE HACIENDA, demandado y recurrido.

*Número:* R-66-350     *Resuelto:* 14 de febrero de 1968

*O'Neill & Borges* y *Eduardo E. Franklin,* abogados de las recurrentes; *J. B. Fernández Badillo, Procurador General,* y *Peter Ortiz, Procurador General Auxiliar,* abogados del recurrido.

El Juez Asociado Señor Rigau emitió la opinión del Tribunal.

Este caso tiene que ver con la forma en que ha de interpretarse la legislación que tiene como objetivo propiciar el crecimiento económico del país.

Las recurrentes son dos corporaciones domésticas y a ambas el Gobierno de Puerto Rico les concedió exención industrial de contribuciones. Las recurrentes pagaron bajo protesta las sumas de $2,307.47 y $2,984.29 por concepto de arbitrios en relación con cierta maquinaria importada por ellas para ser utilizada en sus operaciones y luego de los trámites necesarios recurrieron al Tribunal Superior para obtener su reembolso. Por plantear los dos casos la misma situación éstos fueron consolidados. De una sentencia adversa en dicho Tribunal las peticionarias recurren a nosotros.

En su sentencia, el Tribunal Superior señala como parte de los hechos estipulados por las partes lo siguiente:

"La operación de la parte demandante incluye teñir, fijar, estabilizar con calor y terminar la hilaza de suéteres tejidos. Cuando el suéter tejido se recibe por la parte demandante no es comercialmente mercadeable; su tamaño es demasiado grande, contiene químicas de las operaciones de tejido e hilar, el color es el color natural de la hilaza; cuando se toca es grasoso y no tiene estabilidad, ni en cuanto a tamaño ni a forma.

La parte demandante procesa tres tipos de fibra requiriendo selección separada de químicas para teñir, y procesos para obtener un producto que se pueda mercadear. Las tres fibras son lana, nylon y orlón. Cada uno de los procedimientos es como sigue:

(a) *Lana.* Lana es una fibra natural que se trata con tintes de tipo ácido que reaccionan químicamente con la lana en una

reacción química y reversible. (¹) [*sic*] Además, la lana cuando es tejida es tiesa y dura. Tiene que ser procesada para soltar la hilaza y para permitirle sentirse suave.

(b) *Nylon.* El nylon que se procesa es una hilaza de nylon textralizada. Nylon es una materia termo-plástica, o sea, bajo calor y presión asume una configuración que no se le puede quitar. Los suéteres se ponen en un calentador bajo presión de 30 libras y son calentados a 265° F para estabilizar la hilaza, eliminar la habilidad de encogerse, aumentar su resistencia a encogerse, hacerlos más suaves en textura y permitir aplicación nivelizado de color en el proceso de teñir. El proceso en este caso también es irreversible.

(c) *Orlón.* Orlón es una química denominada en inglés 'acrylic polymer'. Esta hilaza se tiñe en temperaturas en exceso de 180°F, se encoge, y se le da más cuerpo a la hilaza durante el mismo procedimiento de teñir."

Lo anteriormente transcrito da una idea de las operaciones fabriles de las recurrentes. No creemos necesario copiar todo lo estipulado por las partes. Quizás sea conveniente añadir lo siguiente que también fue estipulado:

"Los cambios físicos, en tamaño, textura y estabilidad de la hilaza ("yarn") son completamente irreversibles sin destruir el artículo."

Las recurrentes tienen razón. Sus operaciones son fabriles. No son meramente operaciones de "servicio" como cree el demandado. Si a esas telas y artículos de vestir no se les somete al tratamiento químico descrito en parte en los párrafos antes transcritos dichos productos quedarían solamente semi-elaborados y no podrían utilizarse por el consumidor y, desde luego, no se podrían vender así. Mirado el asunto con perspectiva histórica tenemos que darnos cuenta de que nuestra industrialización está en sus comienzos. Estamos en proceso de aprendizaje. En un Estado que ya cuenta con tradición industrial, Pensilvania, se resolvió un caso muy parecido al de autos. Había allí también—ya en

---

(¹) Claramente esto es un error de dictado. Lo que se quiere decir es "irreversible." V. la estipulación original en el caso Civil 63-2762.

1885—una ley que concedía ciertas exenciones industriales de contribuciones. Las operaciones fabriles de la demandada en aquel caso eran iguales o muy parecidas a las de las aquí recurrentes. El Tribunal concluyó que la demandada se dedicaba a un proceso de manufactura y que la exención le era aplicable. *Commonwealth* v. *Quaker City Dye Works Co.*, 5 Pa. C.C. 94. Dicho caso fue luego citado con aprobación en *Commonwealth* v. *Littlewood & Sons*, 44 Pa. C.C. 310. En Pensilvania, un Estado industrializado, no parece haber duda sobre el particular.

El proceso a que las recurrentes someten esas telas y artículos semi-elaborados es un proceso necesario e indispensable que interviene con las materias primas en una etapa entre el comienzo y la terminación del proceso de manufactura de dichos artículos. Ese proceso cae exactamente dentro de la letra y del espíritu de la ley. La exención que reclaman las recurrentes es la autorizada por el Art. 46 (b) (1) (a) de la ley de arbitrios.[2] Dicho artículo disponía, en lo pertinente, que estarían exentos·del impuesto cualquiera de los siguientes artículos cuando se usasen en una planta manufacturera:

"(a) la maquinaria o equipo usado en la fase fabril del proceso de manufactura *que intervenga* con las materias primas *entre el comienzo y la terminación del proceso de manufactura* incluyendo el ensamblaje o integración de artículos tributables a que se refiere la sec. 4004 de este título." (Énfasis nuestro.)

---

[2] Ley de Impuestos sobre Artículos de Uso y Consumo de Puerto Rico, Ley Núm. 2 de 20 enero 1956; 13 L.P.R.A. sec. 4046(b)(1)(a). La ley aplicable es el texto original del Art. 46(b)(1)(a) de la Ley Núm.'2 de 1956 pues ésa era la ley vigente a la fecha de la importación de las máquinas. Este artículo ha sufrido dos enmiendas posteriores. Una, mediante la Ley Núm. 49 de 18 junio 1958 la cual enmendó el apartado (a) de ese artículo y el cual no está aquí en controversia. La segunda y última enmienda fue hecha por la Ley Núm. 36 de 31 mayo 1963 que enmendó el apartado (b) de ese Art. 46. Como veremos más adelante, la enmienda de 1963 en nada varía la conclusión a que hemos llegado.

Nótese la amplitud que el legislador quiso dar a la ley ya que incluyó hasta el ensamblaje de artículos, lo cual, en ausencia de disposición expresa de ley, no sería propiamente manufactura. Igualmente, al definir el término "fabricante," el legislador en esa misma ley que aquí interpretamos y aplicamos dispuso que "fabricante" significa "cualquier persona que se dedique a la manufactura de cualquier artículo, incluyendo ensambladores o integradores de artículos."—Art. 4 de la Ley; 13 L.P.R.A. sec. 4004(1). ¿Se debe acaso esto a que el legislador, persona que presumimos cultivada, [3] no sabe lo que es fabricar y manufacturar? Desde luego que no. Se debe a que esas exenciones de artículos que se usan en los procesos de manufactura tienen el propósito de hacer atractivo el establecimiento de plantas manufactureras en Puerto Rico porque este país debido a su altísima densidad poblacional no puede depender solamente de la agricultura que puede hacerse en su escaso suelo [4] para crear y mantener un nivel de vida adecuado para sus habitantes. [5] Los problemas económicos de Puerto Rico, incluyendo los problemas de industrialización así como los del uso de sus tierras, hay que verlos a la luz de nuestra realidad geográfica y poblacional. Hay que tener esas condiciones en mente cuando se nos pide que apliquemos a nuestra realidad jurisprudencia originada en otros Estados. Puerto Rico tiene una de las densidades poblaciones más altas del mundo, aproximadamente 700 personas por milla cuadrada. En cambio hay Estados como Montana, Wyoming y Nevada que tienen menos de cinco personas por milla cuadrada y hay 28 Estados que tienen menos de 100 personas por milla cuadrada.

---

[3] *Pueblo* v. *Santiago Vázquez*, 95 D.P.R. 593 (1967).

[4] Menos de ⅓ de su área es cultivable. Koenig, *A Comprehensive Agricultural Program for Puerto Rico* (1953) pág. 48.

[5] Véase la Exposición de Motivos de las Leyes Núm. 184 de 13 mayo 1948, Leyes, pág. 483 y Núm. 6 de 15 diciembre 1953, Leyes, pág. 13 y *Caparra Dairy* v. *Tribl. de Contribuciones*, 67 D.P.R. 314 (1947).

Los Estados Unidos tienen, en conjunto, solamente 50 personas por milla cuadrada. ([6])

Teniendo en mente lo anterior será fácil ver que las exenciones industriales de contribuciones que concede el Gobierno de Puerto Rico no deben interpretarse como las antiguas exenciones contributivas las cuales eran privilegios, por cuya razón era beneficioso al interés público interpretarlos restrictivamente. Por el contrario, las exenciones *industriales* de contribuciones deben interpretarse en forma consonante con su propósito creador. Sólo así se cumple la intención legislativa y además esa interpretación fiel y razonable es la interpretación beneficiosa al interés público. La exención industrial de contribuciones no es una gracia, en el viejo sentido de la frase, que el Gobierno de Puerto Rico confiere sino que es un instrumento que utiliza Puerto Rico, para fomentar la industria y la inversión productiva, todo con el alto objetivo final de hacer posible una vida civilizada, material y espiritual, para los habitantes del país. ([7]) Dichas exenciones son un instrumento realista y eficaz en el esfuerzo del país por eliminar las condiciones "sub-humanas" que en algunos sectores todavía existen. ([8])

El Administrador de Fomento Económico ha expresado lo siguiente:

"El desarrollo industrial constituye el factor básico del singular desarrollo económico de Puerto Rico. Las nuevas fábricas de Fomento generan el 67 por ciento de todo el ingreso neto de la

---

([6])*Statistical Abstract of the United States* (1967) publicado por el Departamento de Comercio de los Estados Unidos, pág. 15; Junta de Planificación de Puerto Rico, *Anuario Estadístico* (1962), pág. 5.

([7])En su esfuerzo por fomentar la inversión industrial mediante exenciones contributivas y de otras maneras, Puerto Rico lucha frente a la competencia vigorosa y atractiva de algunos Estados de la Unión y de otros países subdesarrollados. Basta ver los anuncios sobre el particular que aparecen en el *New York Times* y en las publicaciones dirigidas a los industriales para percatarse de esto.

([8])*Pueblo* v. *Berdecía Rodríguez*, resuelto en 16 de mayo de 1968, opinión concurrente del Juez Asociado Señor Santana Becerra.

manufactura, el 74 por ciento de nuestros embarques al exterior, el 72 por ciento de los empleos fabriles y el 75 por ciento del montante de la nómina industrial." (⁹)

Que el proceso al cual las recurrentes someten los materiales aquí en cuestión es un proceso fabril lo admite el propio Departamento de Hacienda. El párrafo número 7 de la estipulación, transcrito en la sentencia del tribunal de instancia, lee como sigue:

"7. Si operaciones iguales a las que realiza la parte demandante se encontraran coordinadas en un proceso total y contínuo de fabricación de suéteres, gozarían de exención, y no tendrían que pagar arbitrios."

Nos señalan las recurrentes que la planta *Tinto Inc.* que lleva a cabo las mismas operaciones que ellas aquí en Puerto Rico y que también obtuvo exención industrial de contribuciones, obtuvo por decisión administrativa del Negociado de Arbitrios Generales del Departamento de Hacienda, exención del pago de los arbitrios sobre su maquinaria.

---

(⁹) Durand, Rafael, *Progreso, Problemas y Perspectivas del Desarrollo Industrial de Puerto Rico*, publicación de la Administración de Fomento Económico de Puerto Rico (1966).

Sobre la relación directa que existe entre el programa de incentivo industrial y la expansión de la economía de Puerto Rico, véanse, entre otros, los siguientes: Baer, *"Puerto Rico: An Evaluation of a Successful Development Program,"* Q. J. Econ., Vol. 73 (1959); Baker, *"Puerto Rico's Program of Industrial Tax Exemption,"* Geo. Wash. L. Rev., Vol. 18 (1950); Barton, *Puerto Rico's Industrial Development Program 1942–60*, Center for International Affairs, Harvard Univ. (1959); Berlin, *"Puerto Rico as a Foreign Trade and Investment Center,"* Inter-American Economic Affairs, Vol. 14 (1960); Bathia, *"Tax Exemption in a Developing Economy: A Case Study of Puerto Rico,"* Nat'l Tax J., Vol. 13 (1960); Durand, *"Puerto Rico—Industrial Progress in the Caribbean,"* International Trade Review (1963); Goldman, *"Puerto Rico's Tax Opportunities Offer Mutual Benefits,"* Commercial and Financial Chronicle, Vol. 189 (1959), p. 20ff; Jaffe, *People, Jobs and Economic Development: A Case History of Puerto Rico, Supplemented by Recent Mexican Experience* (1959); Moscoso, *"Industrial Development in Puerto Rico,"* Annals of the American Academy of Political and Social Science, Vol. 284 (1953) y Novak, *"A New Appraisal of Puerto Rico in Light of Recent Tax Legislation,"* Tax L. Rev., Vol. 19 (1964).

La diferencia entre *Tinto Inc.* y las recurrentes, se nos dice, es que los dueños de las acciones de *Tinto* son también dueños de las acciones de otras corporaciones que se dedican a otras fases de la operación de fabricar suéters. Pero no parece haber duda que las operaciones que lleva a cabo *Tinto Inc.* son iguales o muy similares a las que llevan a cabo las recurrentes y de que son operaciones fabriles y que su maquinaria "interviene" con las materias primas en algún momento "entre el comienzo y la terminación del proceso de manufactura" de esos artículos. Esa intervención en algún momento entre el comienzo y el fin del proceso fabril, o sea, entre el momento en que la materia prima comienza a ser elaborada hasta que se produce un artículo terminado es lo que exigía la ley para eximir de arbitrios a esa maquinaria.([10]) La ley no se pregunta quién es dueño o no es dueño de las acciones y no distingue entre los distintos dueños. Tampoco podía hacerlo el Departamento de Hacienda. Lo que el Departamento tuvo ante sí fueron plantas y equipos que llevan a cabo operaciones industriales iguales. La determinación administrativa no puede producir soluciones contradictorias para situaciones fundamentalmente idénticas. ([11])

■ Cuando se enmendó el Art. 46 de la Ley de Impuestos en el año 1963 el legislador incluyó esta vez de manera más específica la situación de autos al expresar que estarán exentos del impuesto la maquinaria y equipo usados en plantas manufactureras y al dar tres definiciones de lo que significaría el término "planta manufacturera" incluyó la siguiente:

"Una fábrica que esté exenta bajo la Ley de Incentivo Industrial de 1954, la Ley de Exención Industrial de Contribuciones de 1948, y cualquier otra ley de exención aprobada subsiguientemente para los mismos fines."—*Leyes*, 1963, pág. 59.

---

([10])13 L.P.R.A. sec. 4046(b)(1)(a), Tomo 3-A, pág. 517.

([11])*South P.R. Sugar Co.* v. *Junta*, 82 D.P.R. 847, 865 (1961).

Eso, naturalmente, era lo de esperarse. Cuando una planta industrial obtiene la exención industrial de contribuciones es porque ya ha pasado por un exigente cedazo administrativo. Para obtener la exención el solicitante debe cualificar bajo los términos de la Ley de Incentivo Industrial, debe presentar estados de cuentas y declaraciones juradas, debe concurrir a una vista pública en la Oficina de Exención Contributiva Industrial y deberá aceptar una serie de condiciones. El aviso de la vista se publica con antelación a la misma en dos periódicos de circulación general. El solicitante deberá informar bajo juramento a cuanto ascenderá su inversión inicial, cuántos empleos producirá, a cuanto ascenderá su nómina anual, qué clase de equipo va a utilizar y el valor de dicho equipo, y deberá explicar en forma detallada en qué consistirán sus operaciones en Puerto Rico. Se le exige además que haya tenido buenas relaciones obrero-patronales por lo menos durante los últimos dos años antes de radicar su solicitud.

Antes de decidir sobre cualquier solicitud de exención, el Gobernador de Puerto Rico debe considerar, por mandato expreso de ley, los informes que sobre cada solicitud le someten el Secretario de Hacienda, el Secretario de Justicia, el Secretario del Trabajo y el Administrador de Fomento Económico y los informes de aquellas otras oficinas públicas que a juicio del Gobernador deban rendir un informe sobre la solicitud. Es luego de recibir el informe y la recomendación del Director de la Oficina de Exención Contributiva Industrial que el Gobernador aprobará o no la solicitud de exención. (¹²)

Realmente las determinaciones de qué es industria y de qué es manufactura, y de qué clases de industrias deben obtener la exención industrial de contribuciones, son determinaciones para hacer las cuales está expresamente orga-

---

(¹²) 13 L.P.R.A. secs. 252 y ss.

nizada y equipada, y en lo cual se especializa, la Oficina de Exención Contributiva Industrial del Gobierno de Puerto Rico. Anteriormente hemos tenido ocasión de señalar que lo que es manufacturar y lo que es un producto nuevo o diferente son cuestiones que deben dilucidarse tomando en cuenta las circunstancias de cada situación (para lo cual el procedimiento administrativo antes mencionado es el más adecuado) y la ley que le fuera aplicable. (13)

Por último debemos señalar que los casos que cita el demandado en su alegato son distinguibles del de autos. En el caso de *Francis* v. *Tribunal Contribuciones y Tes.*, 74 D.P.R. 19 (1952), se trataba de una maquinaria que claramente no era industrial. Allí se trataba de unos conductores y elevadores cuya función era transportar el azúcar a unos almacenes. En *Island Properties* v. *Secretario de Hacienda*, 32 D.P.R. 875 (1961), se trataba de piedra triturada y la intervención que allí se hacía con la materia prima no era una fase de un proceso que produjese un producto terminado pues lo que se producía era vendido a constructores que lo utilizaban para la construcción de obras. La situación de ese caso es distinta a la del caso de autos en que, como hemos visto, la intervención con la materia prima ocurre claramente entre el comienzo y la terminación del proceso de manufactura. Lo mismo puede decirse de *Descartes* v. *Tribunal*, supra, donde también se trataba de una operación de triturar piedra. En *Hartman Tobacco Co.* v. *Secretario de Hacienda*, 81 D.P.R. 620 (1959), se trataba de una máquina para empacar tabaco. De lo que anteriormente transcribimos de la estipulación en el caso de autos puede verse que la situación de ambos casos es también distinta.

En cuanto a la cantidad envuelta en este litigio el demandado acepta que las recurrentes tienen razón. La can-

---

(13) *Descartes, Tes.* v. *Tribunal Contribuciones*, 78 D.P.R. 91, 98 (1955).

tidad envuelta es $5,291.76, ó sea, $2,307.47 en el caso 63-2762 y $2,984.29 en el caso 63-1518.

*Por las razones anteriormente expuestas se revocará la sentencia del Tribunal Superior, Sala de San Juan, dictada en este caso en 12 de septiembre de 1966 y en su lugar se dictará otra declarando con lugar las demandas y ordenando el reintegro de los arbitrios reclamados.*