El Juez Asociado Señor Feliberti Cintrón
emitió la opinión del Tribunal.
En el presente caso revisaremos la impugnación del pago de patentes municipales cobradas por el municipio de Cidra (Municipio) en calidad de las deficiencias adeudadas en conformidad con la Ley Núm. 113 de 10 de julio de 1974, según enmendada, conocida como Ley de Patentes Municipales. (1) Específicamente, se cuestiona cómo se debe calcular el volumen de negocios atribuibles a las operacio-nes llevadas a cabo en un municipio por una empresa aco-gida a la Sección 936 del Código Federal de Rentas Inter-nas (Sección 936),(2) según enmendada, la cual también goza de un decreto de exención contributiva según la Ley Núm. 135-1997,(3) conocida como Ley de Incentivos Contri-butivos de 1998.(4)
Analizaremos, además, si la Oficina de Exención Con-tributiva Industrial (OECI) está autorizada a enmendar un decreto con efecto retroactivo en aras de aclarar los tér- *720 minos de un pacto entre el Gobierno de Puerto Rico y el recipiente de unos beneficios contributivos.
I
PepsiCo Puerto Rico, Inc. (PepsiCo), una corporación or-ganizada bajo las leyes del estado de Delaware, se dedica a la venta y manufactura de productos alimenticios en Puerto Rico. Acogida a la Sección 936, PepsiCo eligió el método de contabilidad de profit split para calcular sus in-gresos tributables a nivel federal. 26 U.S.C.A. sec. 936(h)(5)(C)(ii). En resumen, esta fórmula estatutaria de-signa el 50% del ingreso generado por las ventas de mer-cancía producida por PepsiCo en Puerto Rico como el in-greso del negocio sujeto a contribuciones federales.
A su vez, PepsiCo también ha gozado de varias exencio-nes contributivas puertorriqueñas implantadas a través de decretos emitidos por el Gobierno de Puerto Rico. Su de-creto original(5) fue otorgado en el 1977 mediante la Ley Núm. 57 dé 13 de junio de 1963, conocida como Ley de Incentivo Industrial de Puerto Rico de 1963.(6) Cabe seña-lar que, según enmendado, ese primer decreto,(7) al 4 de octubre de 1989, disponía que para efectos de computar sus patentes municipales el volumen de negocio de PepsiCo sería equivalente al 50% de ese volumen, de estar acogido al método de profit split.
PepsiCo luego renovó su exención contributiva con el Gobierno de Puerto Rico en el 2000, esta vez al amparo de la Ley de Incentivos Contributivos de 1998. Aprobado el 3 de febrero de 2000 por el Secretario de Estado, el nuevo decreto(8) le extendió a PepsiCo un 60% de exención sobre las patentes municipales, arbitrios municipales y otras *721 contribuciones municipales impuestas por ordenanza co-menzando el 1 de julio de 2000. El decreto disponía, en su parte relevante, lo siguiente:
BE IT FURTHER DECREED, that pursuant to Section 6(b)(9) of the Act, Grantee shall enjoy sixty percent (60%) exemption from license fees, excises, and other Municipal Taxes of: (i) July 1, 2000 with respect to the production of concentrate products, and (ii) July 1, 2002 with respect to the production of snack foods and pork rind pellets (“chicharrones”).
Sin embargo, en el documento no se incluyó un párrafo similar al del decreto original especificando que se habría de computar el volumen de negocios para propósitos de las patentes municipales acorde con el método de profit split.
Este segundo decreto de PepsiCo se enmendó el 5 de agosto de 2002 para incluir a Pepsi-Cola Manufacturing International, Limited (Pepsi-Cola), una corporación exis-tente bajo las leyes de Bermuda, como beneficiario adicio-nal de las exenciones contributivas.(10) A comienzos del próximo año, PepsiCo vendió a Pepsi-Cola su planta de manufactura de concentrado de bebidas, localizada en el Municipio, y ésta a su vez continuó a cargo de la pro-ducción. (11)
El litigio surgió a raíz de una deficiencia alegada en el pago de las patentes municipales de Pepsi al Municipio, correspondiente a los años contributivos del 2000-2004. Según el Municipio, la deuda se debe a que Pepsi computó erróneamente las patentes a base del 50% de su volumen de negocio, exención que alegadamente no estaba contem-plada en el decreto que entonces poseía ni en la Ley de Patentes Municipales. A tal efecto, el 16 de agosto de 2005 el Director de Finanzas del Municipio le notificó a Pepsi que la deficiencia resultante ascendía a quince millones *722 ochenta y siete mil ciento treinta y cuatro dólares con se-senta y seis centavos ($15,087,134.66).
El 19 de agosto de 2005, Pepsi solicitó oportunamente una vista administrativa ante el Municipio para solicitar la reconsideración de las deficiencias notificadas. Esta se celebró el 5 de octubre de 2005.(12) Durante la vista, se les concedió a los contribuyentes un término para someter un memorando sobre los hechos y el derecho. Sometido, el 9 de noviembre de 2005 se señaló la continuación de la vista para la argumentación oral de las partes para el 17 de noviembre del mismo año.
En su memorando Pepsi argumentó, en síntesis, que la interpretación dada por el Municipio a la Ley de Patentes Municipales era errónea y frustraba la intención legisla-tiva, toda vez que en el caso de un negocio exento según la Ley Núm. 8 de 24 de enero de 1987, conocida como Ley de Incentivos Contributivos de 1987,(13) y otras leyes de incen-tivos contributivos anteriores, la See. 9(27) de la ley eximía del pago de patentes los ingresos no atribuibles a operacio-nes en Puerto Rico en conformidad con la Sección 936. 21 L.P.R.A. sec. 651h(27). Señaló que, acorde a su elección de profit split, método provisto por la Sección 936, el 50% de los ingresos de Pepsi se imputaba al grupo afiliado de Pepsi y, por consiguiente, no se consideraba atribuible a operaciones llevadas a cabo en la Isla. En vista de ello, adujo que actuó correctamente al calcular sus patentes municipales a base de la mitad de los ingresos informados.
El Municipio, por su parte, refutó que la exención men-cionada de las patentes municipales beneficiaba a Pepsi debido a que ésta era una corporación exenta bajo la Ley de Incentivos Contributivos de 1998, y el texto de ese esta- *723 tuto expresamente limitaba su aplicación a negocios exen-tos de acuerdo con la Ley de Incentivos Contributivos de 1987 y leyes anteriores.
El 14 de noviembre de 2005, mientras se dilucidaba el proceso de reconsideración ante el Municipio, Pepsi solicitó una enmienda aclaratoria al decreto de exención contribu-tiva aprobado en el 2000 ante la OECI, entidad adscrita al Departamento de Estado y encargada de administrar la concesión de decretos.(14) La enmienda propuesta por Pepsi exponía lo siguiente:
BE IT FURTHER DECREED, that pursuant to Section 6(b) of the Act, Grantee shall enjoy sixty percent (60%) exemption from license fees, excises and other Municipal Taxes as of: (i) July 1, 2000 with respect to the production of concentrate products, and (ii) July 1, 2002 with respect to the production of snack foods and pork rind pellets (“chicharrones”), provided that Grantee’s sales volume with respect to sales covered by profit-split election under Section 936 of the United States Internal Revenue Code of 1986 shall be fifty percent (50%) of the sales amount, and its sales volume with respect to sales covered by the cost sharing election shall be one hundred percent (100%) of the sales amount. (Énfasis nuestro).
Antes de notificar la determinación final sobre la defi-ciencia alegada en el pago de patentes municipales, el Mu-nicipio fue notificado de esa solicitud de enmienda y éste se opuso a su aprobación.(15) Sus fundamentos principales fueron que la OECI no tenía facultad delegada por la Ley de Incentivos Contributivos de 1998 para conceder la en-mienda, como tampoco la tenía para aprobar una en-mienda de carácter retroactivo. Además, señaló que la exención procurada por Pepsi contravendría la definición del concepto volumen de negocios, dispuesta en la Ley de *724 Patentes Municipales. 21 L.P.R.A. sec. 651a(a)(7). Sin embargo, la Compañía de Fomento Industrial y el Departa-mento de Hacienda favorecieron la enmienda solicitada. (16)
El 14 de diciembre de 2005, estando aun pendiente la decisión de la OECI, el Municipio confirmó las deficiencias preliminarmente notificadas a Pepsi. Inconforme, el 12 de enero de 2006, Pepsi presentó una demanda contra el Mu-nicipio en el Tribunal de Primera Instancia, Sala Superior de Caguas, para impugnar la imposición de las patentes municipales supuestamente adeudadas.(17)
Así las cosas, el 2 de junio de 2006 la OECI aprobó la enmienda a la exención contributiva solicitada por Pepsi con aplicación retroactiva al 3 de febrero de 2000, fecha cuando el decreto comenzó a regir. En consecuencia, el 15 de junio de 2006, el Municipio instó una demanda contra tercero trayendo al pleito a la OECI y al Estado. En ella solicitó una sentencia declaratoria que declarara nula la enmienda al decreto de exención contributiva industrial concedida, por constituir un acto ultra vires.
Entre las múltiples mociones presentadas ante el tribunal de instancia, destacamos que el Estado sometió una Moción Solicitando Desestimación de la Demanda contra Tercero y Pepsi presentó una Moción Solicitando Sentencia Sumaria. El Municipio se opuso a ambas, y a su vez soli-citó, en la alternativa, que se dictase sentencia sumaria a su favor. En particular, el Municipio alegó que existía una *725 controversia de hechos materiales debido a que los ingre-sos informados por Pepsi al Municipio en su planilla de patentes municipales no concordaban con aquéllos infor-mados al Departamento de Hacienda.
El 29 de marzo de 2007, el foro de instancia determinó que no existía controversia sustancial de hechos que impi-diera se resolviese el litigio por la vía sumaria. Determinó “que una vez la [OECI] aprobó la enmienda al decreto de exención contributiva industrial con aplicación retroactiva al 3 de febrero de 2000 la controversia planteada quedó aclarada por lo que la determinación del Municipio Autó-nomo de Cidra en torno a las deficiencias notificadas a Pepsi no puede prevalecer”. También entendió que, con-forme a la Sec. 15 de la Ley de Incentivos Contributivos de 1998, no procedía la revisión judicial de la otorgación de la enmienda al decreto de exención por ser una determina-ción del Secretario de Estado. 13 L.P.R.A. sec. 10114(a). Por consiguiente, declaró “ha lugar” la demanda de Pepsi dejando de este modo sin efecto la determinación final de deficiencia emitida por el Municipio, y “no ha lugar” la de-manda contra tercero del Municipio.
Inconforme, el Municipio acudió en alzada ante el Tribunal de Apelaciones. El 10 de agosto de 2007, el foro ape-lativo intermedio emitió una sentencia en la que revocó al Tribunal de Primera Instancia y ordenó la celebración de un juicio en su fondo, por alegadamente existir una contro-versia de hechos en cuanto a por qué Pepsi reportó una cantidad o un volumen de negocio al Departamento de Hacienda que no concordaba con lo informado al Municipio. Sin embargo, el Tribunal de Apelaciones confirmó al foro de instancia a los efectos de que, según la Ley de Incenti-vos Contributivos de 1998, carecía de competencia para re-visar la enmienda al decreto de exención concedida a Pepsi.
De esa sentencia, tanto el Municipio como el Estado so-licitaron su reconsideración ante el Tribunal de *726 Apelaciones. El primero procuraba que la enmienda se de-clarara nula, y el segundo, que se dispusiera expresamente que la demanda contra tercero no procedía. En cambio, el foro apelativo intermedio acogió esa solicitud de reconside-ración, requiriéndole a las partes que se expresaran en torno a las tres interrogantes siguientes: (1) la legalidad de la actuación del Secretario de Estado al otorgarle retroac-tividad al decreto de exención contributiva; (2) si la OECI podía dejar sin efecto una contribución ya adeudada al Mu-nicipio, por el tiempo que el decreto estuvo vigente, y (3) si la actuación de la OECI requería la intervención de la Rama Legislativa o de la legislatura municipal.
Sometidos los escritos responsivos de Pepsi y el Estado, el Tribunal de Apelaciones emitió la Sentencia en Reconsi-deración para revocar en su totalidad la sentencia sumaria emitida por el foro de instancia y declarar que existían varias controversias de hechos que requerían la celebra-ción de un juicio en su fondo. Entre éstas, mencionó que si Pepsi informó ingresos diferentes ante el Municipio y el Departamento de Hacienda, ello podría ser considerado conducta ilegal, dolosa o fraudulenta. También señaló que al conceder la enmienda retroactiva, la OECI encubrió los actos de Pepsi, por lo que se debería determinar si los fun-cionarios públicos implicados en esa decisión tienen res-ponsabilidad legal por los perjuicios económicos causados al Municipio. Por último, dispuso que la enmienda al de-creto “no [podía] tener una retroactividad que [privara] al Municipio de su facultad de cobrar las patentes municipa-les, que se han tomado como base para sus operaciones fiscales”. Sentencia en reconsideración del Tribunal de Apelaciones, pág. 4.
Pepsi recurrió ante nosotros oportunamente mediante un recurso de certiorari planteando los cuatro errores si-guientes:
1. Incidió el Hon. TA al hacer imputaciones especulativas e *727 infundadas a Pepsi y al resolver que hay controversia de he-chos que requieren vista evidenciaría.
2. Incidió el Hon. TA al reconocerle al Municipio de Cidra legitimación activa para impugnar la determinación de la OECI.
3. Incidió el Hon. TA al negarle validez al decreto de exen-ción contributiva enmendado.
4. Incidió el Hon. TA al revocar al TPI a pesar de que bajo el estado de derecho vigente, aún sin la enmienda al decreto, la deficiencia era improcedente, Petición de certiorari, Caso Núm. CC-2008-136, pág. 12.
Igualmente, el Estado también acudió ante nos me-diante un recurso de certiorari, alegando los siguientes tres errores:
1. Erró el Tribunal de Apelaciones al concluir que la en-mienda al decreto de exención contributiva concedido a Pepsi es revisable por los tribunales y que el Municipio de Cidra tiene legitimación activa para impugnar la misma.
2. Erró el Tribunal de Apelaciones al concluir que la en-mienda al decreto de exención contributiva concedido a Pepsi fue retroactiva.
3. Erró el Tribunal de Apelaciones al concluir que la [OECI] no tiene facultad para enmendar los decretos de exención con-tributiva que concede de manera retroactiva. Petición de cer-tiorari, Caso Núm. CC-2008-140, págs. 21-22.
A. Moción de desestimación
El 29 de febrero de 2008, el municipio de Humacao, que había presentado una solicitud para comparecer como ami-cus curiae ante el Tribunal de Apelaciones, presentó una moción de desestimación en el recurso Núm. CC-2008-136. Planteó que no se perfeccionó el recurso de Pepsi debido a que ésta nunca le cursó la debida notificación en el término jurisdiccional aplicable. Apoyó su argumento con el hecho de que se le habían notificado tanto la sentencia en recon-sideración del Tribunal de Apelaciones como el recurso del Estado presentado ante este Foro. Pepsi se opuso a la mo-ción del municipio de Humacao.
Luego de considerarla, declaramos “no ha lugar” la mo- *728 ción de desestimación del municipio de Humacao. Aun asu-miendo que el Tribunal de Apelaciones le autorizó a com-parecer como amicus curiae en el caso de autos, un amicus curiae no es parte de los procedimientos para efectos de solicitar una revisión judicial. Véase, por ejemplo, JP, Plaza Santa Isabel v. Cordero Badillo, 177 D.P.R. 177, 188 y 191 (2009) (“no es suficiente para ser considerado ‘parte’ que a una persona se le haya notificado de la resolución administrativa”, como tampoco “se consider [a] ‘parte’ [el amicus curiae] a los efectos de notificar copia de los recur-sos de revisión”) (citando Junta Dir. Portofino v. P.D.C.M., 173 D.P.R. 455 (2008), y Lugo Rodríguez v. J.P., 150 D.P.R. 29, 44 (2000)).
B. Solicitud de comparecencia como “amicus curiae”
Por otro lado, el 30 de mayo de 2008 emitimos una re-solución para expedir el auto solicitado y ordenar la conso-lidación de los recursos de Pepsi y el Estado. Después de presentados los alegatos de las partes, el caso quedó some-tido para adjudicación en sus méritos por este Tribunal el 29 de agosto de 2008. No obstante, el 18 de septiembre de 2008, la Asociación de Alcaldes de Puerto Rico .(Asociación de Alcaldes) presentó una Solicitud de Comparecencia como amicus curiae, junto con su alegato. Pepsi objetó esa intervención, señalando que resultaba tardía conforme la Regla 43 del Reglamento de este Tribunal entonces vi-gente, la cual establecía que la petición de comparecencia como amicus curiae “deberá ser presentada por lo menos diez (10) días antes de ser sometido el asunto para su decisión”.(18) 4 L.P.R.A. Ap. XXI-A, R. 43 (ed. 2002). Le asiste la razón. La Asociación de Alcaldes debió haber no-tificado su interés de unirse al caso de autos en o antes de *729 19 de agosto de 2008. Por lo tanto, se declara la solicitud de la Asociación de Alcaldes arriba indicada “no ha lugar”. Véanse: Hernández Torres v. Hernández Colón et al., 127 D.P.R. 974 (1991); Pueblo v. González Malavé, 116 D.P.R. 578 (1985); Pueblo ex rel. L.V.C., 110 D.P.R. 114 (1980).
Resueltos estos asuntos preliminares, procedemos a dis-poner de las controversias planteadas por las partes. Co-menzamos con un análisis del estado de derecho entonces vigente para determinar la manera de calcular las paten-tes municipales de Pepsi, previo a ser enmendado el de-creto de exención.
II
A. La Sección 936 del Código Federal de Rentas Internas
Desde la década de 1920, la política del Congreso de Estados Unidos ha sido eximir de tributación federal los ingresos que sus corporaciones domésticas generan en sus posesiones, entre las cuales se incluye Puerto Rico. C.E. Díaz Olivo, La autonomía de Puerto Rico y sus lecciones en términos fiscales y económicos, 74 Rev. Jur. U.P.R. 263, 276 (2005); F. Hernández-Ruiz, A Guide Across the Spectrum of Section 936, 19 Rev. Jur. U.I.P.R. 131 (1984). Este beneficio se consignó en la Sección 936 del Código Federal de Rentas Internas. 26 U.S.C.A. sec. 936. La típica “empresa 936”, o possessions corporation en inglés, como llegó a conocerse, era una subsidiaria de una corporación matriz dedicada a la fabricación de productos compuestos de materiales ajenos a la posesión, y que luego eran reenviados a Estados Unidos para su consumo (empresas 936). N.H. Kaufman, Puerto Rico’s Possessions Corporations: Do the TEFRA Amendments Go Too Far?, 1984 Wis. L. Rev. 531, 532 (1984).
El Gobierno de Puerto Rico aprovechó esta ventaja es-tratégica para fomentar su desarrollo económico y atrajo *730 negocios continentales a la Isla a través de incentivos con-tributivos adicionales. De esta manera, las empresas 936 gozaban de exenciones locales adicionales a las que les brindaba la Sección 936. Díaz Olivo, op. cit., págs. 277-278; Hernández-Ruiz, op. cit., pág. 132.
En este marco tributario, muchas corporaciones matrices empezaron a manipular la contabilidad del comercio interno entre sus afiliadas. Particularmente, transferían sin costo alguno la titularidad de su propiedad intangible, después de desarrollada en Estados Unidos, a una afiliada en las posesiones para así maximizar los márgenes de ga-nancias libres de impuestos. Díaz Olivo, op. cit., pág. 280; Hernández-Ruiz, op. cit., págs. 135-136; A.B. Stevenson, TEFRA-Changes to Section 936, 35 The Tax Executive 167, 167 (enero 1983). Como consecuencia de esta práctica, en 1982, el Congreso federal enmendó significativamente la Sección 936. Díaz Olivo, op. cit., pág. 280; Hernández-Ruiz, op. cit., págs. 136-137; Kaufman, op. cit., págs. 544—545 y 558. Como parte de los cambios, se añadió la subsección (h) para establecer contribuciones federales sobre ingresos atribuibles a la propiedad intangible de empresas 936.(19) 26 U.S.C.A. sec. 936(h). Esta nueva legislación ofreció, como alternativa a la regla general implantada, la opción de elegir el método de profit split para computar la contri-bución federal.(20) 26 U.S.C.A. sec. 936(h)(5).
Mediante la elección de profit split, el ingreso tributable de una corporación 936 que sea derivado con respecto a la producción de unidades de mercancía o el rendi- *731 miento de servicios llevados a cabo, total o parcialmente en una posesión, equivale al 50% del ingreso tributable com-binado procedente de la venta de esa mercancía o los ser-vicios a una entidad que no forma parte del grupo de afi-liadas de la corporación matriz. 26 U.S.C.A. sec. 936(h)(5)(C)(ii).(21) Es decir, el 50% de los ingresos tributa-bles combinados generados por la venta a un tercero de un producto que se manufacturó entera o parcialmente en Puerto Rico es imputado a la empresa 936 y, por lo tanto, estará libre de contribuciones federales según la Sección 936. El otro 50% de los ingresos se imputa a las afiliadas estadounidenses(22) Hemández-Ruiz, op. cit, págs. 146-147; Kaufman, op. cit., págs. 555-557; Stevenson, op. cit., pág. 176.
*732 B. El efecto que la Sección 936 tuvo sobre las leyes contri-butivas puertorriqueñas.
Aunque la Sección 936 y el método de profit split solo rigen en el ámbito federal, y en nada restringen al Go-bierno de Puerto Rico en cuanto a su poder soberano de establecer sus propias leyes contributivas,(23) el estado de derecho contributivo puertorriqueño se vio afectado como consecuencia de las enmiendas federales descritas.
Por ejemplo, el Departamento de Hacienda de Puerto Rico tomó medidas reglamentarias al amparo de la enton-ces vigente Ley de Contribuciones sobre Ingresos de 1954(24) para reconocer y honrar el nuevo trato a las empresas 936 conforme la Sección 936(h). El 19 de febrero de 1987, se adoptó el Reglamento Núm. 3415 del Departamento de Estado (Reglamento Núm. 3415), titulado “Enmiendas y Adiciones al Reglamento Relativo a la Ley de Contribuciones Sobre Ingresos de 1954, según enmendada, aprobado en 11 de julio de 1957”, del Departamento de Hacienda. El Art. 41A-6 del reglamento disponía, en su parte pertinente, lo siguiente:
Artículo 41A-6. — Ajustes al Ingreso Neto en el Caso de Cor-poraciones Extranjeras Residentes Sujetas a Contribución so-bre Ingresos Federal bajo la Sección 936 del Código de Rentas Internas Federal de 1954, según enmendado. — El ingreso neto derivado por una corporación extranjera residente la cual está sujeta a contribución sobre ingresos federal bajo la Sección 936 del Código de Rentas Internas Federal de 1954, según enmendado, (a la cual nos referiremos de aquí en adelante como “corporación de las posesiones”) de la conducción activa de una industria o negocios en Puerto Rico, será igual al in-greso neto computado por la corporación de las posesiones bajo el inciso (h) de la referida Sección 936 .... íd., pág. 13.
Posteriormente, en el nuevo Código de Rentas Internas de Puerto Rico de 1994 (13 L.P.R.A. sec. 8001 et seq.) se *733 especificó estatutariamente que el Secretario de Hacienda reglamentaría las disposiciones especiales sobre el trato a las empresas 936 y la forma de determinar el ingreso neto de este tipo de contribuyente. 13 L.P.R.A. sec. 8442(g).(25) El Secretario de Hacienda aprobó el 3 de abril de 1998 el Reglamento Núm. 5780, según enmendado. El Art. 1042-7 del reglamento, en lo relativo al ingreso neto, dispuso lo siguiente en términos casi idénticos al derogado Regla-mento Núm. 3415:
... El ingreso neto derivado por una corporación extranjera residente sujeta a contribución sobre ingresos federal bajo la Sección 936 del Código de Rentas Internas Federal, según en-mendado (denominada de aquí en adelante como “corporación de las posesiones”) de la explotación activa de una industria o negocio en Puerto Rico, será igual al ingreso neto computado por la corporación de las posesiones bajo el apartado (h) de la referida Sección 936. Reglamento Núm. 5780, supra, pág. 29.
Así pues, el Departamento de Hacienda asumió una po-sición que complementaba el método de profit split para efectos del cálculo de impuestos sobre ingresos derivados en Puerto Rico por una empresa 936.
Por otro lado, el efecto que la Sección 936(h) tuvo sobre el cálculo de patentes municipales siguió otro curso. Según la Ley de Patentes Municipales, éstas se calculan a base del volumen de negocio atribuible a operaciones en el municipio que impone la patente autorizada. 21 L.P.R.A. sec. 651d(b). La Ley de Patentes Municipales define el volumen de negocios como “los ingresos brutos que se reciben o se devenguen por la prestación de cualquier servicio, por la venta de cualquier bien, o por cualquier otra industria o negocio en el municipio donde la casa principal realiza sus *734 operaciones”. 21 L.P.R.A. sec. 651a(a)(7)(A)(i). Añade que ingresos brutos significa “la totalidad de los ingresos de fuentes dentro y fuera de Puerto Rico que sean atribuibles a la operación que se lleva a cabo en cada municipio”. 21 L.P.R.A. sec. 651a(a)(7)(A)(ii). Además, define el concepto “atribuibles a la operación” como “la totalidad de los ingre-sos derivados dentro y fuera de Puerto Rico que reciba o devengue una persona relacionada con la explotación de una industria o negocio en Puerto Rico”. 21 L.P.R.A. sec. 651a(a)(15).
En contraste con los ajustes que se hicieron a las contri-buciones sobre ingresos, el cálculo de las patentes munici-pales para las empresas 936 no se alteró, por lo menos inicialmente, ni estatutariamente, ni por la vía reglamen-taria en vista de la Sección 936(h). Sin embargo, en ocasio-nes, la OECI estipulaba mediante los decretos de exención contributiva otorgados bajo su ámbito, que el volumen de ingresos para propósitos de patentes municipales sería el 50% de los ingresos, esto en armonía con el método de profit split. Así, por ejemplo, el 4 de octubre de 1989, el decreto de exención contributiva original de Pepsi se enmendó para proveer que sus patentes municipales se calcularían a base de la mitad de su volumen de negocio.
No fue hasta el 1991, casi una década después de adoptada la fórmula de profit split al amparo del Código Federal de Rentas Internas, que se enmendó la Ley de Patentes Municipales a través de la Ley Núm. 82-1991 (1991 Leyes de Puerto Rico 676) (Ley 82),(26) para eximir del pago de patentes municipales “[l]os ingresos, no atribuibles a operaciones en Puerto Rico, de corporaciones exentas bajo *735 la sec. 10038 et seq. del Título 13, y leyes de incentivos industriales anteriores, en conformidad con las disposicio-nes de las Secciones 936 y 482 del Código Federal de Rentas Internas”. 21 L.P.R.A. sec. 651h(27). En otras palabras, una empresa 936 que gozase de una exención contributiva otorgada por la Ley de Incentivos Contributivos de 1987 o por alguna ley de incentivos industriales anterior y que, a la misma vez, estuviese acogida a la elección de profit split al amparo de la Sección 936, quedaba exenta de pagar pa-tentes municipales sobre el 50% de sus ingresos, ya que conforme al Código Federal de Rentas Internas esa mitad de sus ingresos se le imputaba a la compañía matriz no ubicada en Puerto Rico y no era, por lo tanto, atribuible a operaciones en la Isla. En términos prácticos, esta exen-ción redujo el volumen de negocios que servía como base para calcular las patentes municipales a la mitad.
C. Interpretación de la ley
En el caso de autos, Pepsi era una empresa 936 acogida a la elección de profit split, según el Código Federal de Rentas Internas y, a partir de 3 de febrero de 2000, gozaba de un nuevo decreto de exención contributiva otorgado me-diante la Ley de Incentivos Contributivos de 1998. Es me-nester señalar que el nuevo decreto carecía de instrucción alguna en cuanto a cómo se computaría el volumen de ne-gocios de Pepsi para efectos de calcular sus patentes municipales. A pesar de esa omisión en el nuevo decreto, Pepsi y el Estado plantean que bajo el estado de derecho entonces vigente, la compañía actuó correctamente al ren-dir sus patentes municipales correspondientes a 2000-2004 conforme la exención provista por la Ley 82.
El Municipio refuta esa interpretación de la Ley 82 y argumenta que la misma ley dispone claramente que la exención solo beneficia a aquellas empresas exentas me-diante la Ley de Incentivos Contributivos de 1987 y leyes *736 de incentivos contributivos anteriores. Alega que, dado que el nuevo decreto de Pepsi se dio de acuerdo con la Ley de Incentivos Contributivos de 1998, la cual no está contem-plada en la Ley 82, la compañía no estaba cobijada por la exención alegada y no podía eximir el 50% de sus ingresos a la hora de calcular sus patentes municipales. Por lo tanto, el Municipio aduce que proceden las deficiencias notificadas.
En respuesta, Pepsi alega que la verdadera intención de la Ley 82 era establecer no solo una exención, sino un mé-todo uniforme para que las corporaciones acogidas a la elección de profit split, al amparo de la Sección 936, calcu-laran sus patentes municipales en Puerto Rico. Por otro lado, Pepsi también razona, junto con el Estado, que la Ley 82 no podía incluir expresamente la Ley de Incentivos Con-tributivos de 1998 por el simple hecho de que esta última todavía no existía. No obstante, dada su smilitud a la Ley de Incentivos Contributivos de 1987, la exención de paten-tes municipales debe extenderse naturalmente y por analogía. De otra forma, se incumpliría con la exposición de motivos de la Ley de Incentivos Contributivos de 1998. En apoyo a su argumento, Pepsi y el Estado señalan, ade-más, que en vista de la Ley 82, era innecesario especificar en el nuevo decreto que se calcularían las patentes muni-cipales a base del 50% del volumen de negocio conforme el método de profit split, como se hizo en el decreto anterior. Por consiguiente, la enmienda solicitada para el nuevo de-creto no fue más que una gestión aclaratoria y las deficien-cias son improcedentes.
Nos enfrentamos, entonces, con la tarea inherente de todo tribunal de interpretar la ley objeto de esta controversia para determinar el alcance de la exención de patentes municipales según la Ley 82, es decir, si cobija o no a Pepsi. Comenzamos este análisis hermenéutico con el principio de que una interpretación integral de una ley “consis- *737 te en auscultar, averiguar, precisar y determinar cuál era la voluntad legislativa al aprobar la ley”. IFCO Recycling v. Aut. Desp. Sólidos, 184 D.P.R. 712, 738 (2012), citando R.E. Bernier y J.A. Cuevas Segarra, Aprobación e interpretación de las leyes en Puerto Rico, 2da ed. rev., San Juan, Pubs. J.T.S., 1987, Vol. 1, pág. 241.
El primer paso en este proceso es leer y examinar el propio lenguaje de la ley. Bernier y Cuevas Segarra, op. cit., pág. 275. Es norma establecida que la letra clara de una ley reina. De este modo, el Art. 14 del Código Civil dispone que “[c]uando la ley es clara libre de toda ambigüedad, la letra de ella no debe ser menospreciada bajo el pretexto de cumplir su espíritu”. 31 L.P.R.A. sec. 14. Sin embargo, “[d]ebe rechazarse la aplicación estrecha, literal y mecánica de la ley sin atender a las razones que motivaron su aprobación y a los hechos a los cuales la norma ha de aplicarse. No debe frustrarse el propósito del estatuto interpretándolo al pife] de la letra.” Bernier y Cuevas Segarra, op. cit., pág. 277. Véase Consejo Titulares v. DACo, 181 D.P.R. 945, 959 (2011).
Acorde con lo anterior, hemos resuelto que aunque la ley sea clara, eso no elimina el ejercicio jurídico de este Tribunal de tener que interpretarla. IFCO Recycling v. Aut. Desp. Sólidos, supra, pág. 739; Consejo Titulares v. DACo, supra, pág. 958. Para llegar a una conclusión fiel a la verdadera intención de la Asamblea Legislativa, precisamos adentrarnos en su desarrollo historial. Consejo Titulares v. DACo, supra, págs. 960-961. Como explicamos en el caso Orsini García v. Srio. de Hacienda, 177 D.P.R. 596, 612 (2009), “nadie puede comprender e interpretar la significación de cualquier legislación con la mera lectura de su texto, sin conocer el contexto histórico, cultural y social en el cual se aprobó”. Esto requiere la consideración de varios factores que acompañan la ley, incluyendo su ex-posición de motivos, la política pública del tiempo, los in- *738 formes de las comisiones legislativas y el diario de sesio-nes, entre otros. Véase Bernier y Cuevas Segarra, op. cit, págs. 242-243.
Por último, en lo que concierne a la interpretación de exenciones contributivas, nuestra jurisprudencia sirve de guía útil. En el caso de los estatutos contributivos he-mos expresado que éstos no se interpretarán de forma ex-tensiva, sino justa, para cumplir con sus propios y expresos términos. Asimismo, deberán interpretarse en contra de la imposición de la contribución, cuando de éstos no surge claramente el propósito de imponerla. Pfizer Pharm. v. Mun. de Vega Baja, 182 D.P.R. 267, 279 (2011); IFCO Recycling v. Aut. Desp. Sólidos, supra, pág. 742. En ese último caso citamos a Café Rico, Inc. v. Mun. de Mayagüez, 155 D.P.R. 548, 559-560 (2001), donde expresamos que “las exenciones contributivas, por ser privilegios excepcionales que concede el Estado, no deben extenderse más allá de los términos expresos y exactos del estatuto que las otorga y toda duda debe resolverse en contra de la existencia de la exención. Véase Interior Developers v. Mun. de San Juan, supra, pág. 707. No obstante, también hemos establecido la norma de que las exenciones contributivas no deben ser interpretadas restrictivamente si ello derrota la intención legislativa. Pfizer Pharm. v. Mun. de Vega Baja, supra; Orsini García v. Srio. de Hacienda, supra, pág. 616; Textile Dye Works, Inc. v. Srio. de Hacienda, 95 D.P.R. 708, 713 (1968).
Discutidos estos preceptos, pasamos a interpretar la Ley 82 y la exención contributiva establecida.
D. El alcance de la Ley 82
La Ley 82 se originó con el Proyecto de la Cámara 1302. Iniciado el 26 de abril de 1991, el Diario de Sesiones co-rrespondiente revela que el proyecto de ley original no in-cluía una exención de patentes municipales para los ingre- *739 sos no atribuibles a operaciones en Puerto Rico conforme la Sección 936 del Código Federal de Rentas Internas. Más bien, su enfoque principal fue enmendar la Ley de Paten-tes Municipales para agilizar el mejor manejo y lograr el mayor cobro de patentes, ya que éstas representaban la segunda fuente de ingresos municipales. La Comisión de Asuntos Municipales no recibió la recomendación de in-cluir la exención objeto del presente caso hasta junio de ese año, después de que el Secretario de Hacienda y la Asocia-ción de Industriales de Puerto Rico tuvieron la oportuni-dad de ofrecer sus respectivas reacciones al proyecto de ley. El Informe del Secretario de Hacienda expresó:
[B]ajo el programa de incentivos industriales de Puerto Rico opera un gran número de las llamadas “corporaciones 936”. El ingreso de las corporaciones 936 está sujeto a ciertos cómputos y ajustes que se hacen bajo las Secciones 482 y 936 del Código Federal de Rentas Internas, los cuales nuestro Departamento reconoce otorgándole un tratamiento correlativo para propósi-tos de contribución sobre ingresos. Es enteramente apropiado que estas peculiaridades del cómputo del ingreso de las corpo-raciones 936 sean también reconocidas para propósitos de pa-tente municipal. El Departamento, por tanto, sugiere se añada el siguiente párrafo a la enumeración de partidas exentas de la Sección 9 de la Ley:
En el caso de corporaciones exentas bajo la Ley. Núm. 8 del 24 de enero de 1987, según enmendada, y leyes de incentivos industriales anteriores y subsiguientes, los ingresos no atribui-bles a las mismas de conformidad con las disposiciones de las Secciones 936 y/o 482 del Código Federal de Rentas Internas de 1986. (Énfasis nuestro). Informe del Proyecto de la Cámara 1302 suscrito por el Secretario de Hacienda el 5 de junio de 1991.
La Asociación de Industriales de Puerto Rico reiteró el mismo mensaje y reprodujo la misma redacción para la exención en su memorando dirigido a la Comisión.
Por otro lado, en el Senado, la Administración de Fo-mento Económico sometió un informe escrito a la Comisión de Desarrollo Socio-Económico de Corporaciones y Munici- *740 pios sobre el Proyecto del Senado 1056, también correspon-diente a la Ley 82. Advirtió que “las enmiendas aquí pro-puestas no deben afectar adversamente nuestro programa de fomento o desarrollo industrial, el cual es de vital im-portancia para el Pueblo de Puerto Rico y para los propios municipios en general”. Informe del Administrador de la Administración de Fomento Económico con relación al Pro-yecto del Senado 1056 de 28 de mayo de 1991, pág. 1.
Indicó, además, lo siguiente:
[D]ebemos asegurarnos de que las enmiendas propuestas es-tén conforme a nuestro programa de fomento industrial para así poder mantener nuestra credibilidad como un gobierno de leyes, serio y responsable. No podemos atraer industrias a Puerto Rico ofreciéndoles irnos incentivos y beneficios garan-tizados por decretos contractuales y luego de que estén en Puerto Rico, cambiar las reglas de juego mediante legislación o por interpretaciones agresivas con el afán de cobrar más contribuciones a la industria.
Es por esta razón que nuestras recomendaciones conllevan el objetivo de que se aclare el estado de derecho actual y no el de crear un nuevo estado de derecho. (Enfasis suprimido). In-forme del Administrador, supra, pág. 2.
Partiendo de ese punto de vista, la Administración de Fomento Económico recomendó que se añadiera el si-guiente párrafo a las exenciones de patentes municipales ya reconocidas en la Ley de Patentes Municipales:
Los ingresos no atribuibles a corporaciones exentas bajo la Ley Núm. 8 del 24 de enero de 1987, según enmendada, y leyes de incentivos industriales anteriores, de conformidad con las disposiciones de las secciones 936 y/o 482 del Código Federal de Rentas Internas de 1986. (Comillas omitidas). Informe del Administrador, supra, pág. 7.
En su explicación para esa sugerencia, ofreció como pro-pósito lo siguiente:
[R]econocer y honrar los ajustes de contabilidad que se hacen bajo las secciones 936 y 482 para determinar qué ingresos co- *741 rresponden a las corporaciones 936 haciendo negocios en Puerto Rico. El Departamento de Hacienda, en consideración a la seriedad de estos ajustes, ha reconocido y honrado los mismos desde un principio, por lo tanto, resulta razonable, necesario y conveniente para fines de claridad, que también estén reconocidos como exentos para propósitos del pago de pa-tente municipal.
Como cuestión de hecho, [el apartado tiene] el objetivo de establecer la situación de derecho existente para que quede me-ridianamente claro que tales eventos están exentos del pago de patente municipal. Por consiguiente, ... no tiente] impacto eco-nómico adverso a los municipios ya que dichos eventos están exentos de tributación. (Énfasis nuestro). Informe del Admi-nistrador, supra, pág. 7.
De primera impresión, y en vista del propósito de cum-plir con los ajustes de contabilidad que requiere la Sección 936, uno supondría que la exención sugerida aplicaría a toda empresa 936 que pague patentes municipales en Puerto Rico, esto sin importar bajo qué ley de incentivos contributivos advino exenta. Sin embargo, en contraste con las recomendaciones del Secretario de Hacienda y la Aso-ciación de Industriales de Puerto Rico, la Administración de Fomento Económico redactó su versión de la exención sin disponer qué ocurriría en cuanto a la exención en situa-ciones futuras, esto es, una vez que la Ley de Incentivos Contributivos de 1987 terminara de regir.
El 8 de agosto de 1991, la exención sugerida en los va-rios informes mencionados fue acogida en el borrador del Proyecto de la Cámara 1302, el cual en su See. 9 disponía:
Se exime del pago de patentes impuestas por autorización de esta ley a:
(27) Los ingresos, no atribu[i]bles a operaciones en Puerto Rico, de corporaciones exentas bajo la Ley Núm. 8 de 24 de enero de 1987, según enmendada y leyes de incentivos indus-triales anteriores, de conformidad con las disposiciones de las Secciones 936 y 482 del Código de Rentas Internas Federal.
Del expediente legislativo no se desprende discusión al- *742 guna sobre el efecto o propósito buscado con esta exención en particular, ni una explicación de por qué la versión fi-nalmente incorporada al proyecto de ley no dispuso para su aplicación prospectiva.
Lo significativo, sin embargo, es que los legisladores tu-vieron ante sí dos variaciones de la misma exención —una claramente más amplia que la otra— y aprobaron la segunda. Esta decisión legislativa merece reconocimiento y gran respeto, pues al escoger la segunda versión no queda duda de que la intención fue formular una exención de pa-tentes municipales sujeta a ciertos límites internos. En este caso, la construcción clara y precisa de la Ley 82 ciñe la disponibilidad de la exención a corporaciones 936 exen-tas por la Ley de Incentivos Contributivos de 1987 o leyes semejantes anteriores.
En Nieves Cruz v. U.P.R., 151 D.P.R. 150, 160 (2000), enfrentamos una situación análoga. En ese caso tuvimos que determinar si una ley tenía efecto retroactivo aunque, de su faz, guardaba silencio a tal respecto. Observamos que durante el proceso de aprobación de la ley, hubo testi-monio a favor de su retroactividad en las vistas públicas. No obstante, resolvimos que, de existir una intención legis-lativa a tales efectos, lo lógico hubiera sido incluir las pa-labras necesarias en el texto de la ley para expresar su intención. Al no hacerlo, entendimos que los legisladores optaron por no brindarle carácter retroactivo al estatuto. Como corolario, en el caso de autos, al no incorporar la cláusula “y bajo leyes de incentivos contributivos subsi-guientes” a la exención, aunque se sugirió en varios infor-mes, lo lógico es concluir que los legisladores no quisieron decretar una exención tan expansiva.
Del contexto más amplio de la Ley 82, tampoco encon-tramos justificación para extender sus términos por analo-gía a corporaciones que advinieron exentas bajo leyes de incentivos contributivos posteriores al 1987. Tanto su ex-posición de motivos como el debate que transcurrió en el *743 hemiciclo, pusieron hincapié sobre el fin general que per-seguía la reforma municipal de facilitar una mayor auto-nomía y base fiscal para los municipios. No es difícil perci-bir cómo una exención de patentes del 50% de los ingresos de las empresas 936 detraería de ese propósito estatutario.
Además, conforme IFCO Recycling v. Aut. Desp. Sólidos, supra, y los casos ahí citados, nuestra implantación de las exenciones contributivas debe marcar un equilibrio entre una interpretación restrictiva del estatuto que, a la vez, cumple a cabalidad con los términos y el propósito del pri-vilegio tributario.
El planteamiento de Pepsi de que no se incluyó la Ley de Incentivos Contributivos de 1998 expresamente en la Ley 82 porque para aquel entonces todavía no existía, es inmeritorio y poco convincente. Desde el 1954, las leyes de incentivos contributivos se han aprobado sujetas a sus res-pectivas fechas de vigencia o expiración. (27) La Legislatura tenía pleno conocimiento de que la Ley de Incentivos Con-tributivos de 1987 solo tendría efecto hasta el 1997. 13 L.P.R.A. sec. 10038 n., hoy derogada. Al especificar que la exención aplicaría a las corporaciones exentas mediante ésta y leyes anteriores, se marcó un punto después del cual obraría un trato diferente para los ingresos de una em-presa 936 no atribuibles a operaciones en Puerto Rico se-gún la Sección 936. El hecho de que la Ley de Incentivos Contributivos de 1987 venciera en una fecha exacta am-para nuestro razonamiento de que la intención legislativa *744 no fue otorgar una exención de patentes municipales para corporaciones cobijadas bajo cualquier estatuto de incenti-vos contributivos.
En vista de todo lo anterior, concluimos que la exención de patentes municipales aprobada en la Ley 82 y recogida en la See. 9(27) de la Ley de Patentes Municipales, no aplica a corporaciones 936 exentas por las leyes de incentivos industriales subsiguientes al 1987. Por lo tanto, Pepsi no cualificaba para esa exención según el estado de derecho entonces vigente, aunque sí lo adquirió posteriormente, conforme a la enmienda a su decreto de exenciones contributivas aprobado por la OECI, como explicaremos más adelante.
Entendemos que nuestra decisión implica un resultado que vulnera algunos de los motivos que impulsaron la Ley de Incentivos Contributivos de 1998, tales como fortalecer la base industrial de la Isla y fomentar un mayor empleo al reducir los costos de hacer negocios en Puerto Rico. Expo-sición de Motivos de la Ley Núm. 135-1997 (1997 Leyes de Puerto Rico 636). Al no eximir los ingresos no atribuibles a operaciones en Puerto Rico conforme al método de profit split del pago de patentes municipales para las corporacio-nes 936, exentas por la Ley de Incentivos Contributivos de 1998 y leyes posteriores, éstas pudieran enfrentar una do-ble tributación sobre esos fondos: orna bajo el Código Federal de Rentas Internas a través de sus afiliadas en Estados Unidos, y otra en la modalidad de patentes municipales. En situaciones como la de Pepsi, donde una compañía fa-bricante que gozaba de esta exención de patentes munici-pales, pero que le fue eliminada al renovar su decreto se-gún las leyes contributivas más recientes, este costo adicional inesperado ciertamente no es acogido. A la larga, esto podría causar el abandono de muchas empresas esta-dounidenses de la Isla y la eliminación de un sector impor-tante de empleo.
No obstante estas serias preocupaciones, “no ‘es *745 función de este [TJribunal corregir las deficiencias que en-cuentre en una legislación sometida a su estudio e interpretación. Lo único que podemos hacer es señalar esas deficiencias, para que ellas sean corregidas por el Poder Legislativo’ ”. (Enfasis en el original). First Bank de P.R. v. Mun. de Aguadilla, 153 D.P.R. 198, 207-208 (2001) (citan-do The Texas Co. v. Domenech, Tes., 50 D.P.R. 432, 451 (1936)). Después de todo, “[l]a función del Tribunal Supremo es interpretar la ley, sin juzgar su bondad o sabiduría”. Bernier y Cuevas Segarra, op. cit., pág. 243.
III
En vista de la notificación inicial de las deficiencias, Pepsi le solicitó a la OECI una enmienda a su decreto para que especificara que el volumen de negocios fuera calcu-lado a base de la mitad de sus ingresos conforme el método de profit split. Aunque el Municipio conocía que la OECI estaba considerando esa enmienda e, incluso, participó en varias ocasiones en el proceso de consideración, emitió su notificación final de las deficiencias antes de que la OECI resolviera la solicitud. Unos meses después, la OECI otorgó la enmienda con efecto retroactivo a la fecha de co-mienzo del decreto. De esta manera, según alegan Pepsi y el Estado, las deficiencias se tomaron en improcedentes. Nos toca determinar la validez de la enmienda al decreto de Pepsi impugnada por el Municipio.
Como cuestión de umbral, analizaremos si el Municipio tiene legitimación activa para oponerse a la enmienda.
A. Legitimación activa del Municipio para impugnar la enmienda al decreto otorgado por la OECI
Como es bien sabido, la revisión judicial de una acción administrativa se presume, a menos que la legislatura lo haya prohibido expresamente. Federación v. Molina, 160 D.P.R. 571, 583 esc. 16 (2003); Bonilla v. Char- *746 dón, 118 D.P.R. 599, 609 (1987); D. Fernández Quiñones, Derecho administrativo y Ley de Procedimiento Administrativo Uniforme, 2da ed., Bogotá, Ed. Forum, 2001, Sec. 8.2, pág. 420.
En el caso de la Ley de Incentivos Contributivos de 1998 no hay duda de que, efectivamente, se restringió esa facultad a los tribunales. La ley claramente estableció que “[t]odas las decisiones y determinaciones del Secretario de Estado bajo esta parte serán finales y contra las mismas no procederá revisión judicial o administrativa u otro recurso, a menos que específicamente se disponga otra cosa”. 13 L.P.R.A. sec. 10114(a).
En Pfizer Pharm. v. Mun. de Vega Baja, supra, pág. 293, esbozamos que esta disposición estatutaria, junto con la condición del contrato que la ley le brindó a los decretos, ciertamente sirvió para promover la seguridad y confianza de las corporaciones estadounidenses y extranjeras que trasladaron sus negocios a Puerto Rico incentivados por el favorable sistema contributivo.
No obstante, de acuerdo con el mandato legislativo, si bien es cierto que “[n]o le compete a los tribunales pasar juicio sobre la sabiduría” de las determinaciones del Secre-tario de Estado de conferir o no una exención contributiva, Pfizer Pharm. v. Mun. de Vega Baja, supra, pág. 294, esto no inmuniza por completo los decretos que se aprobaron en la Ley de Incentivos Contributivos de 1998 de revisión en los foros judiciales.
Es una norma bien establecida que aunque urna ley elimine la oportunidad de revisión de una actuación administrativa, si se menoscaban los derechos constitucionales o estatutarios de una parte, no se puede impedir el acceso de ésta a los tribunales. Pfizer Pharm. v. Mun. de Vega Baja, supra, pág. 282; Fernández Quiñones, op. cit, pág. 420. Otra ocasión en la que se puede rechazar u obviar una prohibición legislativa de revisión judicial es cuando una agencia haya actuado de manera ultra vires y en con- *747 travención de su ley orgánica. Fernández Quiñones, op. cit., pág. 421.
En el caso de autos, el Municipio impugna la decisión de la OECI, aprobada por el Secretario de Estado, de enmen-dar la exención contributiva de Pepsi por dos razones. Pri-mero, el Municipio entiende que la OECI solo tiene la fa-cultad legal para eximir a Pepsi de un 60% de sus patentes municipales, y que no puede determinar cuál será el volu-men de negocios de una empresa para propósitos de calcu-lar sus patentes municipales. Según el Municipio, eso es un término que la Ley de Incentivos Contributivos de 1998 no contempla y tampoco se le ha delegado a la OECI. Se-gundo, sostiene que la OECI carece de facultad para con-ceder una enmienda con efecto retroactivo al decreto de exención contributiva de Pepsi. Alega que la OECI se exce-dió de sus poderes delegados por la Ley de Incentivos Con-tributivos de 1998 al ordenar que se enmendara el decreto de esa manera.
Nos compete aclarar que existe una diferencia significa-tiva entre impugnar la decisión de una agencia por estar en desacuerdo con sus méritos, y alegar que la decisión es nula por constituir un acto ultra vires. La posición del Mu-nicipio cae bajo la segunda categoría. No se cuestiona la determinación de la OECI de autorizar una exención con-tributiva a favor de Pepsi por entender que no promueve los intereses de la isla o constituye un abuso de discreción, sino que se alega que la enmienda es per se nula porque la concesión constituye un acto ultra vires. El Tribunal de Primera Instancia no apreció esta diferencia al determinar que no le correspondía pasar juicio sobre la enmienda. Ciertamente, no tenía autoridad para sopesar los méritos de la enmienda, pero sí podía determinar si, como cuestión de derecho, la OECI actuó en el marco de su autoridad delegada por ley.
Por consiguiente, resolvemos que el Municipio sí tiene legitimación activa para presentar su demanda contra ter- *748 cero interpuesta contra el Estado. Ahora determinaremos si le asiste la razón en lo atinente a su impugnación de la exención en controversia.
B. Validez de la enmienda al decreto
Los argumentos del Municipio traen a colación dos as-pectos de la enmienda que requieren análisis: (1) si la OECI tenía la facultad para incluir una cláusula en su decreto, estableciendo cuál sería el volumen de negocios para efectos de calcular patentes municipales, y (2) si tenía la facultad de conceder una enmienda con carácter retroactivo.
(1) La OECI podía modificar la Ley de Patentes Muni-cipales mediante un decreto de exención contributiva
Aunque la Asamblea Legislativa les ha delegado un poder tributario a los municipios para brindarle un mayor grado de autonomía fiscal, éstos están sujetos a las leyes y restricciones que regulan esa potestad. Pfizer Pharm. v. Mun. de Vega Baja, supra, págs. 286-287. Como limitación de este poder, los municipios no pueden imponer contribuciones sobre los ingresos que el Gobierno haya designado exento. íd., págs. 287-288. La Ley de Incentivos Contributivos de 1998, al igual que sus antecedentes y la ley que luego la remplazó, modificaron la facultad impositiva de los municipios al proveer para la otorgación de decretos de exención contributiva a través de la OECI. Id., págs. 287-289. Este Tribunal ha reconocido que estos decretos son instrumentos esenciales para la promoción del programa de incentivos industriales de Puerto Rico y el desarrollo económico de la Isla. Id., págs. 279-280; Textile Dye Works, Inc. v. Srio. de Hacienda, supra, pág. 713.
Los negocios que recibieron decretos mediante la Ley de Incentivos Contributivos de 1998 gozaron de algunos términos uniformes que se adoptaron legislativamente, tal como una exención de 60% sobre las patentes *749 municipales, arbitrios municipales y otras contribuciones municipales impuestas por ordenanza. 13 L.P.R.A. see. 10105(b)(1). Por otro lado, la Ley de Incentivos Contributi-vos de 1998 también dispuso que los decretos
... se considerarán de la naturaleza de un contrato entre el concesionario, sus accionistas, socios o dueños y el Gobierno de Puerto Rico, e incluirán aquellos términos y condiciones que sean consistentes con el propósito de esta parte y que promue-van la creación de empleos mediante el desarrollo social y eco-nómico de Puerto Rico, tomándose en consideración la natura-leza de la petición o acción solicitada, así como los hechos y circunstancias relacionadas de cada caso en particular que puedan ser de aplicación. 13 L.P.R.A. sec. 10112(f).
No todos los decretos son iguales, ya que cada negocio solicitante tiene sus preocupaciones y necesidades particulares. Por cierto, “cada Decreto es único y su nego-ciación ha conllevado un estricto análisis de la solicitud y las circunstancias particulares de los contratantes”. Pfizer Pharm. v. Mun. de Vega Baja, supra, pág. 283. No obs-tante, los términos específicos de cada decreto individual obligan a los municipios de la misma manera que aquéllos deletreados en el texto de la Ley de Incentivos Contributi-vos de 1998.
Recientemente reconocimos este hecho en Pfizer Pharm. v. Mun. de Vega Baja, supra, donde la controversia giraba en torno a cómo se debería tributar unos intereses recibi-dos por Pfizer devengados de préstamos realizados a favor de corporaciones extranjeras no dedicadas a industria en Puerto Rico. El decreto de Pfizer objeto de ese caso, otor-gado por la Ley de Incentivos Contributivos de 1998, dis-ponía que los ingresos de fuentes de fuera de Puerto Rico se considerarían ingresos de fomento industrial, sujetos a la tasa fija provista y exentos en un 60% del pago de pa-tentes municipales. íd., pág. 273. Resolvimos que, aunque los ingresos no serían tributables de forma alguna con-forme a las leyes contributivas, los términos del decreto facultaron al Municipio de Vega Baja a imponer el pago de *750 patentes sobre los intereses. íd., pág. 292. Rechazamos el argumento del Municipio de Vega Baja —también plan-teado por el Municipio de Cidra en el caso de autos— de que la OECI no podía conceder una exención que no estaba expresamente especificada en el estatuto por medio de un decreto. íd., págs. 292-293. Al analizar la Ley de Incenti-vos Contributivos de 1998, notamos que “la Asámblea Le-gislativa ha creado un procedimiento que otorga gran dis-creción al funcionario contratante para aceptar ofertas o requerir condiciones que redunden en los mejores intereses económicos y sociales de nuestra Isla”. íd., pág. 293.
Los decretos de exenciones contributivas, compuestos tanto por las condiciones impartidas por la Ley de Incentivos Contributivos de 1998 como los términos particulares a cada negocio, representan una limitación adicional al poder de los municipios de imponer patentes municipales sobre los ingresos devengados por negocios en su demarcación geográfica. Teniendo en cuenta su naturaleza de contrato, éstos tienen fuerza de ley supletoria que vinculan a los municipios a la hora de ejercer su delegada facultad tributaria. Véase Art. 1044 del Código Civil, 31 L.P.R.A. sec. 2994.
En el caso de autos, la enmienda al decreto de Pepsi modificó significativamente el método para cuantificar el volumen de negocios sujeto a patentes municipales esta-blecido en la Ley de Patentes Municipales, al ordenar que este se redujera por la mitad. No obstante, acorde lo anterior, si el Secretario de Estado determinó que incorporar el concepto profit split al cálculo de patentes municipales fo-mentaba un mayor desarrollo socioeconómico, tenía la po-testad de hacerlo. En cuanto a esa determinación, no nos compete revisar o cuestionarla. 13 L.P.R.A. sec. 10114(a). *751 El hecho de que la OECI acordó un estándar distinto al que se encuentra en la Ley de Patentes Municipales, y que éste no emana del texto explícito de la Ley de Incentivos Con-tributivos de 1998, no derrota la validez del decreto.
(2) La OECI podía enmendar un decreto retroactiva-mente para reflejar el intento inicial de las partes
No hay duda de que la Ley de Incentivos Contributivos de 1998 autoriza a la OECI a enmendar las concesiones que haya aprobado. 13 L.P.R.A. see. 10112. En el caso de recibir una solicitud de enmienda, el procedimiento estatu-tario requiere que la OECI prepare un proyecto de decreto y lo circule a las agencias y los municipios concernientes, entre otras entidades, para su evaluación económica y fiscal. 13 L.P.R.A. sec. 10112(j)(2). Éstos tendrán un pe-riodo de veinte días para someter un informe u opinión al Director de la OECI, quién podrá descansar en las reco-mendaciones ahí suministradas. 13 L.P.R.A. sees. 10112(j)(2) y 10112(j)(4). Sin embargo, una lectura de la ley, así como su reglamento no arroja luz sobre si esta fa-cultad incluye el poder de aprobar una enmienda con efecto retroactivo a la fecha cuando comenzó a regir el decreto. Esa es la interrogante planteada por el Municipio.
Por otro lado, como señalamos, la Ley de Incen-tivos Contributivos de 1998 establece que las concesiones de exención contributiva constituyen un contrato entre el negocio recipiente del decreto y el Gobierno de Puerto Rico. 13 L.P.R.A. sec. 10112(f). Por consiguiente, los decretos se regirán por las normas generales relativas a los contratos. Pfizer Pharm. v. Mun. de Vega Baja, supra, pág. 283; Qume Caribe, Inc. v. Srio. de Hacienda, 153 D.P.R. 700, 729 (2001).
Pasamos entonces a revisar las reglas que go-biernan todo contrato para determinar si las partes podían enmendar el decreto con efecto retroactivo, a los fines de *752 esclarecerlo. El Código Civil pauta varias normas ilustra-tivas para este ejercicio. Comenzamos con el principio de la autonomía de voluntad de las partes enmarcado por el Art. 1207 del Código Civil, el cual consagra cualquier pacto que sea conveniente, siempre que no sea contrario a la ley, moral u orden público. 31 L.P.R.A. sec. 3372. Pfizer Pharm. v. Mun. de Vega Baja, supra, pág. 283.
Ahora bien, el alcance de las obligaciones pactadas es una función directa de la intención de las partes. VDE Corporation v. F & R Contractors, 180 D.P.R. 21, 35 (2010). A tal efecto, el Art. 1233 del Código Civil dispone que “[s]i los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas. Si las palabras parecieren contrarias a la intención evidente de los contratantes, prevalecerá ésta sobre aquéllas”. 31 L.P.R.A. sec. 3471. Este artículo va a la par con el próximo, el cual prescribe lo siguiente: “Para juzgar la intención de los contratantes, deberá atenderse principalmente a los actos de éstos, coetáneos y posteriores al contrato”. Art. 1234 del Código Civil, 31 L.P.R.A. sec. 3472. Se pueden tomar en consideración, además, los actos y las circunstancias anteriores a la otorgación del contrato que puedan indicar la voluntad de los contratantes. VDE Corporation v. F & R Contractors, supra, pág. 35; Unisys v. Ramallo Brothers, 128 D.P.R. 842, 853 (1991); Ramírez, Segal & Látimer v. Rojo Rigual, 123 D.P.R. 161, 174 (1989); Marina Ind., Inc. v. Brown Boveri Corp., 114 D.P.R. 64, 69—70 (1983) (citando Merle v. West Bend Co., 97 D.P.R. 403, 409-410 (1969)).
Volviendo al caso de autos, resumimos brevemente lo sucedido. El decreto original de Pepsi, otorgado en el 1977, se enmendó en octubre de 1989 para especificar que, si estuviera acogida a la fórmula de profit split, sus patentes municipales se calcularían a base del 50% de su volumen de negocios. Dos años más tarde, entró en vigor la Ley 82. *753 Cuando Pepsi solicitó y recibió su nuevo decreto en el 2000, éste nada disponía sobre el cómputo del volumen de nego-cios para efectos de patentes municipales. Sin embargo, Pepsi y el Estado alegan que siempre entendieron que se-guiría rigiendo la exención sobre la mitad del volumen de negocios. Ambos asumieron, aunque erróneamente, que la exención aprobada mediante la Ley 82 aplicaría a los de-cretos otorgados al amparo de la Ley de Incentivos Contri-butivos de 1998, eliminando así la necesidad de incluir ese término en el decreto. No fue hasta que el Municipio le notificó a Pepsi de las deficiencias adeudadas que la em-presa se percató de la necesidad de enmendar el decreto para que se aclarara la aplicación del criterio de profit split para efectos de sus patentes municipales. Cabe señalar que la enmienda solicitada siempre se designó como una medida de clarificación. (28)
En fin, el trato que la OECI le brindaba a Pepsi antes de la otorgación del decreto en controversia, las nuevas dispo-siciones estatutarias de la Ley de Patentes Municipales a través de la Ley 82, además de las manifestaciones de las partes obligadas por el decreto revelan la intención com-partida por Pepsi y el Estado. Éstos siempre concibieron que se eximiera la mitad del volumen de negocio de Pepsi a la hora de ésta calcular sus patentes municipales. Aunque el decreto no lo expresó taxativamente, la intención preva-lece sobre el instrumento redactado.
Partiendo de la premisa de que desde un principio fue implícitamente acordado entre las partes que se usaría el *754 método de profit split para calcular las patentes municipa-les de Pepsi, la enmienda al decreto en esta ocasión no fue sustantiva. No añadió nuevas exenciones contributivas otorgadas a favor de Pepsi ni alteró las fechas cuando las exenciones entrarían en efecto. No cabe duda de que el propósito primordial de la enmienda al decreto fue esclare-cer para fines de los municipios, que el trato que Pepsi recibía anteriormente continuaría en efecto.(29)
El Municipio inmeritoriamente alega que es un tercero afectado por la aprobación de la enmienda y que, al no dar su consentimiento, resulta inválida. Según dispone la Ley de Incentivos Contributivos de 1998, los municipios no son terceros, sino participantes en el proceso de aprobación de un decreto. Estos tienen la oportunidad de brindarle a la OECI su recomendación desfavorable, de haberla. 13 L.P.R.A. sec. 10112(j)(2). No obstante, la misma ley dispone que el Director de la OECI no está obligado a obtener la aprobación de un municipio afectado para otorgar una exención contributiva. 13 L.P.R.A. sec. 10112(j)(4).
También diferimos de la conclusión del Tribunal de Ape-laciones en cuanto a que no se podía enmendar el decreto de exención contributiva retroactivamente si ello tuviera el efecto de privar al Municipio de fondos que esperaba recibir. Si bien es cierto que la enmienda objeto de este recurso impacta al Municipio negativamente al reducir una fuente de sus fondos, los hechos revelan que el Muni-cipio tenía pleno conocimiento de que el decreto se podía enmendar retroactivamente al 1 de julio de 2000 antes de haber concluido su revisión administrativa de las deficien-cias preliminarmente notificadas. Es decir, antes de haber advenido final y firme su determinación de las insuficien- *755 cias en las patentes de Pepsi. El 14 de noviembre de 2005, Pepsi solicitó la enmienda al decreto ante la OECI. En el mismo mes, el 29 de noviembre de 2005, el Municipio so-metió su primera oposición a la enmienda. Sin embargo, el 14 de diciembre de 2005 confirmó la deficiencia notificada a Pepsi apresuradamente antes de finalizarse la determi-nación de la OECI en cuanto a la enmienda solicitada. No vemos con simpatía este tipo de acción prematura. El Mu-nicipio conocía de la posibilidad de que su imposición de patentes no prevaleciera si se aprobaba la enmienda, y asi-mismo ocurrió.
Por lo tanto, teniendo en cuenta las circunstancias del presente caso y el hecho de que las partes compartían la misma intención en cuanto a los términos que el decreto impartiría, la OECI no actuó de manera ultra vires al apro-bar la enmienda aclaratoria retroactiva, la cual es válida.(30) Pepsi estaba autorizado a reducir el volumen de sus negocios en un 50% y computar sus patentes munici-pales sobre esa mitad. Luego, gozaba de una exención de 60% sobre esa cantidad.
IV
Por último, resta el asunto de si existe o no una contro-versia de hechos que amerite que el caso vaya a juicio, o si por el contrario, los planteamientos esgrimidos son aptos para resolverse por la vía sumaria.
La Regla 36.3 de Procedimiento Civil, 32 L.P.R.A. Ap. III,(31) dispone que se dictará sentencia suma- *756 ria si de los documentos que obran en el expediente del tribunal, incluyendo específicamente las alegaciones, depo-siciones, contestaciones a interrogatorios y admisiones ofrecidas y declaraciones juradas, de haberlas, se demos-trase que “no existe controversia real sustancial en cuanto a ningún hecho material y que, como cuestión de derecho, debe dictarse sentencia sumaria a favor de la parte promovente”. Mejías et al. v. Carrasquillo et al., 185 D.P.R. 288, 299 (2012).
En innumerables ocasiones hemos definido un hecho material como aquél que puede afectar el resultado de la reclamación según el derecho sustantivo aplicable. Mejias et al. v. Carrasquillo et al., supra; S.L.G. Szendrey-Ramos v. Consejo Titulares, 184 D.P.R. 133 (2011); Ramos Pérez v. Univisión, 178 D.P.R. 200, 213 (2010). Además, una controversia de hecho es suficiente para derrotar una moción de sentencia sumaria solo cuando causa en el tribunal una duda real y sustancial sobre algún hecho relevante y pertinente. S.L.G. SzendreyRamos v. Consejo Titulares, supra; Córdova Dexter v. Sucn. Ferraiuoli, 182 D.P.R. 541, 556 (2011); Ramos Pérez v. Univisión, supra, pág. 214. De no existir la controversia, lo que resta es aplicar el derecho a los hechos establecidos, convirtiendo urna vista en los méritos en innecesaria. Vera v. Dr. Bravo, 161 D.P.R. 308, 334 (2004).
Si bien es cierto que en el mecanismo de la sentencia sumaria rige el precepto reconocido de que toda inferencia que se haga de los hechos incontrovertidos debe hacerse a favor de la parte que se opone a esta, Mejias et al. v. Carrasquillo et al., supra, la parte opositora a que se dicte sentencia sumaria no puede cruzarse de brazos y descansar en sus alegaciones. Córdova Dexter v. Sucn. Ferraiuoli, supra. Le corresponde refutar los hechos materiales que están en disputa mediante la presentación de evidencia sustancial. S.L.G. Szendrey-Ramos v. Consejo Titulares, supra; Córdova Dexter v. Sucn. Ferraiuoli, supra. *757 “Esto es, la parte que se opone viene obligada a contestar de forma detallada y específica aquellos hechos pertinentes para demostrar que existe una controversia real y sustan-cial que debe dilucidarse en juicio”. Ramos Pérez v. Univisión, supra, pág. 215.
Recientemente, en S.L.G. Szendrey-Ramos v. Consejo Titulares, supra, reiteramos las circunstancias bajo las cuales no se dictará sentencia sumaria. Estas son cuando: (1) existen hechos materiales y esenciales controvertidos; (2) hay alegaciones afirmativas en la demanda que no han sido refutadas; (3) surge de los propios documentos que se acompañan con la moción una controversia real sobre algún hecho material y esencial, o (4) como cuestión de derecho no procede. íd.; Vera v. Dr. Bravo, supra, págs. 333-334. Véase, además, Ramos Pérez v. Univisión, supra, pág. 217.
Pasamos ahora a aplicar los criterios del marco legal descrito al caso de autos. El Municipio alega que existe una controversia de hechos materiales debido a que los ingre-sos informados por Pepsi en su planilla de patentes muni-cipales en concepto de profit split no concuerdan con aqué-llos informados al Departamento de Hacienda.(32) Según el Municipio, hay una diferencia ascendente a billones de dó-lares entre ambas. El Municipio deduce que la marcada discrepancia se debe a que Pepsi utilizaba un método o una interpretación de profit split distinta para computar sus patentes municipales y para calcular sus contribuciones sobre ingresos.
Cabe señalar que las cifras usadas por el Municipio en su comparación se derivaron de los estados financieros de *758 Pepsi, los cuales la entidad acostumbraba incluir junto a sus planillas presentadas ante el Departamento de Hacienda. Específicamente, el Municipio se concentró en la línea denominada profit-split and cost-sharing allocations contenida en esos estados financieros.
Pepsi, por su parte, refuta que las diferencias numéri-cas presentan una controversia de hechos material. Sos-tiene, además, que no son comparables las cantidades re-portadas por ellos a ambos organismos gubernamentales por dos razones. Primero, Pepsi indica que los números que el Municipio utilizó como “profit split Hacienda” no son los que realmente se informaron al Departamento de Hacienda, sino que provienen de las notas consignadas en el estado financiero de la empresa referente a transacciones entre compañías afiliadas (Related-Party Transactions). La Sra. Janice Franco Torres (señora Franco), Directora de Finanzas de Pepsi, testificó en su deposición, la cual nunca fue contradicha por el Municipio, que el estado financiero no contiene la información que Pepsi oficialmente reporta al Departamento de Hacienda, aunque admitió que volun-tariamente envía este documento como anejo a las plani-llas de contribuciones sobre ingresos. Pepsi también nos trae a la atención que según estas notas, esa cifra repre-senta un concepto que se describió de la manera siguiente: “Significant transactions with related parties ... in addition to those shown elsewhere in the financial statements”. Pepsi mantiene, entonces, que el Municipio creó una con-fusión de hechos innecesaria con sus aseveraciones inco-rrectas al tratar de cualificar una nota al estado financiero de Pepsi como lo que se le reportó al Departamento de Hacienda.
Segundo, Pepsi explica por qué los números del Depar-tamento de Hacienda y del Municipio no son tan solo dis-tintos, sino incomparables. La señora Franco explicó que las diferencias entre los informes rendidos al Municipio y al Departamento de Hacienda se deben a que el primero *759 sólo refleja las ventas, mientras que el segundo presenta los ingresos más los gastos.(33) Es decir, las partidas corres-ponden a conceptos diferentes. Por lo tanto, aunque la de-finición de profit split es la misma, la información a la que ha de aplicarse en cada planilla es distinta. Para efectos del Municipio, se reducen los ingresos brutos atribuibles a Cidra en un 50%, mientras que para el Estado se reduce la mitad de los ingresos netos generados en Puerto Rico.
En reconsideración, el Tribunal de Apelaciones resolvió que el pleito ante sí presentaba una controversia de hechos que requería la celebración de un juicio en su fondo. Tam-bién hizo mención, por primera vez, de posible dolo y fraude de parte de Pepsi y otros funcionarios públicos. A estos efectos, dispuso:
Luego de revisar el caso, ciertamente existen varias contro-versias de hecho que requieren la celebración de mi juicio en su fondo para adjudicarse en justicia los derechos de las partes.
A manera de ejemplo, cabe señalar que el contribuyente Pepsi informó ingresos distintos ante dos entes gubernamen-tales, es decir que hay una conducta que pudiera, de darse unas circunstancias particulares, considerarse ilegal, dolosa o fraudulenta que debe ser evaluada así como los efectos jurídicos.
*760 Otro aspecto que la reconsideración nos ayudó a ver es que la enmienda retroactiva al decreto por parte de la [OECI] ocu-rrió después que el Municipio de Cidra había determinado la deficiencia contributiva, y por lo tanto la alegada conducta dolosa e ilegal de Pepsi quedaría encubierta por la interven-ción de unos funcionarios públicos cuya conducta debe ser analizada por el Tribunal.
Las interrogantes que surgen de las alegaciones de las par-tes, requieren ser clarificadas para determinar si hay respon-sabilidad legal de esos funcionarios públicos por los perjuicios económicos causados al Municipio de Cidra. Sentencia en re-consideración del Tribunal de Apelaciones, págs. 2 y 3.
Un análisis detenido de la prueba provista por las par-tes nos lleva a concluir que los números señalados por el Municipio no se pueden comparar de la mañera que esta parte sugiere. Los ingresos tributables reportados al De-partamento de Hacienda recogen los ingresos netos de Pepsi correspondientes a la isla entera. De otra parte, los ingresos informados al Municipio están limitados a aque-llos ingresos brutos devengados en sus lindes geográficos. Toda vez que Pepsi tenía operaciones en los municipios de Barceloneta y Guayama en adición a Cidra, es lógico que los números no concuerden. Pepsi efectivamente rebatió la alegada controversia de hechos planteada por el Municipio.
En cuanto a la conclusión del Tribunal de Apelaciones concerniente a la conducta posiblemente dolosa o ilegal de Pepsi y los funcionarios públicos relacionados, es menester notar que el Municipio aclaró en su alegato que ello no fue una alegación ni conclusión solicitada de su parte. Una vez resuelto que la diferencia numérica se explicó razonable-mente, no consta prueba alguna en el expediente para fun-damentar las insinuaciones de dolo o fraude planteadas por el Tribunal de Apelaciones.
Por consiguiente, erró el tribunal apelativo intermedio al especular que pudo haber conducta dolosa por parte de Pepsi, y que la diferencia entre las planillas presentadas al Municipio y al Departamento de Hacienda constituía una *761 controversia real que impedía que el caso de autos se re-solviera por la vía sumaria.
V
Desde un principio, la pregunta medular de este litigio ha sido si Pepsi podía eximir un 50% del volumen de sus negocios del cobro de patentes municipales. En su notifica-ción preliminar y durante los procesos administrativos y judiciales subsiguientes, el Municipio caracterizó la defi-ciencia de Pepsi como el resultado de ésta haber calculado sus patentes municipales a base de esa exención. A tal efecto, Pepsi manifestó lo siguiente en su Moción Solici-tando Sentencia Sumaria, pág. 11:
[N]o existe controversia entre las partes de que la razón para alegar la existencia de una deficiencia por parte del [Municipio], es su posición de que las demandantes deben tributar para fines de patente municipal el total del volumen de ventas que aparece en sus estados, sin poder reducir el 50% que corresponde a sus afiliadas bajo el método de “profit split”.
Igualmente, en su alegato, el Municipio identificó la controversia fundamental como la siguiente:
[L]a forma en que se computará el “volumen de negocios” para determinar el pago sobre las patentes municipales; si corres-ponde el método de contabilidad utilizado por los peticionarios en contribución sobre ingresos llamado “profit-split” o si se debe utilizar la definición de “volumen de negocios” dispuesta en la Ley de Patentes Municipales ....
Según ya establecimos, el decreto enmendado de Pepsi le confirió el derecho de calcular sus patentes municipales a base de la mitad del volumen de sus negocios atribuibles a operaciones en el Municipio. Luego, sobre esa cantidad, Pepsi gozaba de una exención de 60%. Lo que entonces resta por determinar es, si a base de esta fórmula todavía existe alguna deficiencia en sus patentes. La respuesta es tan fácil como entrar la cifra adecuada —es decir, el volu- *762 men de negocio de Pepsi atribuible a sus operaciones en el Municipio— en la ecuación descrita.
Como parte de su investigación de las patentes munici-pales rendidas por Pepsi, el Director de Finanzas de Cidra verificó la existencia de las deficiencias notificadas usando como punto de comparación los números reflejados en las declaraciones de volumen de negocios presentadas por Pepsi en el Municipio para cada uno de los cuatro años investigados. (34) Según la tabla incorporada a la notifica-ción preliminar del Municipio para demostrar las deficien-cias particulares, éste interpretó el monto denominado Total Sales en las declaraciones de volumen de negocios como el verdadero volumen de negocio de Pepsi producido en el Municipio, y no el que Pepsi había reportado en sus planillas.
Sin embargo, Pepsi argumenta que la cifra en la cual se enfocó el Municipio, es decir, Total Sales, representa la suma total de las ventas atribuibles al Municipio, más aquellas realizadas por las afiliadas de Pepsi en Estados Unidos. Según la matemática reflejada en las declaracio-nes de volumen de negocios de Pepsi, se tenía que restar una cantidad designada como Export Sales de los Total Sales para llegar al volumen de negocio de Pepsi realmente devengado en el Municipio, es decir, Local Sales.(35) Es a base de este número, según Pepsi, que se aplica la exención de 50% para determinar el volumen de negocio sujeto a patentes municipales. Argumenta que de la otra manera se estarían imponiendo contribuciones sobre ingresos que nunca le pertenecieron a Pepsi.
*763 Por lo tanto, las partes no nos han puesto en posición para poder determinar con certeza cuál fue el volumen de negocio de Pepsi en el Municipio que se debería usar para calcular las patentes municipales correspondientes a los años contributivos de 2000 al 2004. El expediente no con-tiene las planillas ni las declaraciones de volumen de ne-gocio presentadas por Pepsi en el Municipio para cada uno de los años investigados. Tampoco obra una explicación de-tallada de la contabilidad de Pepsi en su declaración de volumen de negocios, o se advierte en qué consisten los Export Sales que alegadamente no se pueden incluir en las ventas llevadas a cabo desde el Municipio.
Ciertamente, la cifra que últimamente se utilizará en calidad de volumen de negocio atribuible a operaciones en el Municipio tendrá que reunir los criterios expuestos en la Ley de Patentes Municipales. 21 L.P.R.A. sec. 651a(a)(7). Después de todo, el decreto de exención contributivo no alteró la definición de volumen de negocio sujeto a paten-tes municipales, sino que proveyó que esa cantidad se re-dujera por la mitad.
VI
En conformidad con todo lo indicado, se revoca la Sen-tencia en Reconsideración de 15 de diciembre de 2007 emi-tida por el Tribunal de Apelaciones. Se devuelve el caso al Tribunal de Primera Instancia, Sala de Caguas, para que las partes provean la información necesaria y éste determine si, a base de la fórmula aquí clarificada, existe defi-ciencia alguna en las patentes municipales de Pepsi.

Se dictará Sentencia de conformidad.

El Juez Presidente Señor Hernández Denton concurrió con el resultado sin opinión escrita. El Juez Asociado Señor Estrella Martínez disintió con una opinión escrita.

 21 L.P.R.A. sec. 651 et seq.

 26 U.S.C.A. sec. 936.

 13 L.P.R.A. sec. 10101 et seq., hoy derogada.

 La ley vigente sobre esta materia es la Ley Núm. 73-2008 (13 L.P.R.A. sec. 10641 et seq.), conocida como Ley de Incentivos Económicos para el Desarrollo de Puerto Rico. No obstante, dado que los hechos del caso de autos ocurrieron durante la vigencia de la Ley de Incentivos Contributivos de 1998, nos limitaremos a su aplicación.

 Decreto No. 77-57-1-113.

 13 L.P.R.A. sec. 10012 et seq., derogada.

 Decreto No. EI-89-123 (77-57-I-113)-C.

 Decreto No. 98-135-1-111.

 13 L.P.R.A. sec. 10105(b).

 Decreto No. EI-01-92 (98-135-1-11D-A.

 Para efectos del resto de esta opinión, nos referiremos a PepsiCo y Pepsi-Cola conjuntamente como “Pepsi”.

 La notificación de deficiencia del municipio de Cidra (Municipio) y la recon-sideración solicitada se llevaron a cabo en conformidad con la Sec. 16 de la Ley de Patentes Municipales, según enmendada, 21 L.P.R.A. sec. 651o.

 13 L.P.R.A. sec. 10038 et seq., hoy derogada.

 13 L.P.R.A. sec. 10112.

 El 29 de noviembre de 2005, el Municipio presentó ante la Oficina de Exen-ción Contributiva Industrial (OECI) un Memorando en Oposición a Propuesta En-mienda al Decreto de Exención Contributiva Industrial.

 El Municipio reiteró su desacuerdo con la concesión de la enmienda en otras dos ocasiones. Éstas ocurrieron el 8 de febrero de 2006 mediante su Réplica en Torno a (Denominado) Memorando en Oposición a Propuesta Enmienda al Decreto de Exención Contributiva Industrial Presentado por la Parte Peticionaria, y el 23 de marzo de 2006 a través de su Memorando en Oposición a Borrador de Enmienda al Decreto de Exención Contributiva Industrial Presentado por la Compañía de Fo-mento Industrial.

 Pepsi también prestó una fianza por la cantidad total de dieciséis millones cuatrocientos cuarenta y cuatro mil novecientos setenta y seis dólares con setenta y nueve centavos ($16,444,976.79), monto equivalente a la deficiencia, más el 9% de ésta en concepto de intereses, conforme la Sec. 16 de la Ley de Patentes Municipales, según enmendada, 21 L.P.R.A. sec. 651o.

 La Regla 43 del nuevo Reglamento de este Tribunal, el cual entró en vigor en enero de 2012, es prácticamente idéntica a la anterior. In re Reglamento Tribunal Supremo, 183 D.P.R. 386, 478-479 (2011).

 Las enmiendas a la Sección 936 de 1982 no fueron suficientes para que sobreviviera la disposición contributiva. En el 1996, el Congreso federal acordó eli-minar por completo la Sección 936 gradualmente durante un periodo de diez años. C.E. Díaz Olivo, La autonomía de Puerto Rico y sus lecciones en términos fiscales y económicos, 74 Rev. Jur. U.P.R. 263, 280-281 (2005); A. Ramírez Marcano, Más allá de la Sección 9S6: El futuro económico de Puerto Rico para el año 2000, 32 Rev. Jur. U.I.P.R. 207, 213 (1997).

 La otra opción incluida en la Sec. 936(h) se llamaba cost sharing. 26 U.S.C.A. sec. 936(h)(5)(C)(i).

 La Sec. 936(h)(5)(C)(ii), en su parte pertinente, disponía:
“(ii) Profit split.—
“(I) General rule. — If an election of this method is in effect, the electing corporation’s taxable income derived from the active conduct of a trade or business in a possession with respect to units of a product produced or type of service rendered, in whole or in part, by the electing corporation shall be equal to 50 percent of the combined taxable income of the affiliated group (other than foreign affiliates) derived from covered sales of units of the product produced or type of service rendered, in whole or in part, by the electing corporation in a possession.
“(IV) Covered sales. — For purposes of this paragraph, the term ‘covered sales’ means sales by members of the affiliated group (other than foreign affiliates) to persons who are not members of the affiliated group or to foreign affiliates.” 26 U.S.C.A. sec. 936(h)(5)(e)(ii).

 La sección del reglamento del Código Federal de Rentas Internas dedicada a preguntas y respuestas sobre profit split disponía:
“Combined taxable income of the possessions corporation and affiliates from the sale of the possession product will include income attributable to all intangibles, including both manufacturing and marketing intangibles, associated with the product.
The profit split option is applied to the taxable income of the possessions corporation from sales of the possession product to foreign affiliates and unrelated persons. Fifty percent of that income is allocated to the possessions corporation, and the remainder is allocated to the appropriate affiliates ....
“Income allocated to the possessions corporation shall be treated as possession source income and as derived from the active conduct of a trade or business within the possession.” 26 C.F.R. 1.936-6, sec. (b)(1) (respuestas núm. 6, 8 y 14), págs. 171 y 176.

 Véanse: Art. VI, Sec. 2, Const. P.R., L.P.R.A., Tomo 1; Interior Developers v. Mun. de San Juan, 177 D.P.R. 693, 703 (2009).

 13 L.P.R.A. sec. 3001 et seq., derogada.

 Esa disposición legal provee lo siguiente:
“(g) Contribuyentes que tienen en vigor una elección bajo la sec. 936 del Código de Rentas Internas Federal de 1986. — El Secretario podrá reglamentar disposiciones especiales para la determinación del ingreso neto de un contribuyente que tenga en vigor una elección bajo la see. 936 del Código de Rentas Internas de 1986, según enmendado”.

 La Ley Núm. 82-1991 (1991 Leyes de Puerto Rico 676) enmendó las Secs. 2, 4, 5, 7, 9, 10, 11, 13, 14 y 52 de la Ley Núm. 113 de 10 de julio de 1974, según enmendada, conocida como Ley de Patentes Municipales, 21 L.P.R.A. sec. 651 et seq. No obstante, en esta opinión haremos referencia únicamente al Art. 5, el cual agrega la Sec. 9(27) a la Ley de Patentes Municipales, 21 L.P.R.A. sec. 651h(27).

 Véanse: la Ley de Incentivo Industrial de Puerto Rico de 1954 (13 L.P.R.A. sec. 10001 et seq.), hoy derogada (vigente hasta el 31 de diciembre de 1963); Ley de Incentivo Industrial de Puerto Rico de 1963 (13 L.P.R.A. sec. 10012 et seq.), hoy derogada (vigente hasta el 30 de junio de 1983); Ley de Incentivos Industriales de 1978 (13 L.P.R.A. sec. 10024 et seq.), hoy derogada (vigente hasta el 30 de junio de 1988); Ley de Incentivos Contributivos de 1987 (13 L.P.R.A. see. 10038 et seq.), hoy derogada (vigente hasta el 31 de diciembre de 1997); Ley de Incentivos Contributivos de 1998 (13 L.P.R.A. sec. 10101 et seq.), hoy derogada (vigente hasta el 31 de diciembre de 2007). En el 2008, sin embargo, entró en vigor la Ley de Incentivos Económicos para el Desarrollo de Puerto Rico, 13 L.P.R.A. sec. 10641 et seq., sin fecha límite alguna.

 La carta suscrita por Pepsi, para solicitar la enmienda al decreto a la OECI expresa, en su parte pertinente, lo siguiente:
“The amendment is to clarify that Grantees have properly determined the taxable sales volume for purposes of the Municipal License Tax under the methodology provided by Section 936 of the U.S. Internal Revenue Code.”
Luego, en su memorando a la OECI, Pepsi reiteró que la “solicitud persigue clarificar que el método a seguir los Peticionarios en la determinación de su volumen de negocios para efectos de determinar su responsabilidad de patente municipal está basado en el método que disponía el decreto anterior de los Peticionarios”.

 Por cierto, la Compañía de Fomento Industrial reconoció que calcular sus patentes municipales conforme al método de profit split, tal como fijó su decreto original, formó una práctica operacional de Pepsi (“an operational mechanism of their business”) y una ventaja de hacer negocios en Puerto Rico.

 Como resultado, procedía la desestimación de la demanda contra tercero instada por el Municipio.

 Hacemos referencia a las Reglas de Procedimiento Civil de 1979 por ser las que estaban vigentes cuando se dictaron las sentencias recurridas. Sin embargo, el análisis sobre cuándo procede una sentencia sumaria sigue siendo el mismo según la Regla 36 de Procedimiento Civil de 2009 (32 L.P.R.A. Ap. V). S.L.G. Szendrey-Ramos v. Consejo Titulares, 184 D.P.R. 133 (2011).

 Notamos que el Municipio también identificó como hechos en controversia: (1) la forma en que se debía computar el volumen de negocio para determinar el pago de patentes municipales, es decir, si correspondía el método de profit split o la defi-nición de la Ley de Patentes Municipales, y (2) la legalidad de la retroactividad del decreto de exención contributiva solicitado por Pepsi. Sin embargo, estas interrogan-tes son, más bien, controversias de derecho que no requieren la determinación de hecho alguno y que hoy hemos resuelto.

 El intercambio siguiente se dio entre el licenciado Hernández, represen-tante del Municipio, quien hizo las preguntas, y la señora Franco, quien respondió:
“P: Esa es la pregunta, esa es la pregunta. ¿Por qué es la diferencia?
R: En la patente municipal se presenta el ‘profit split’ como un cincuenta por ciento de las ventas.
P: Unjú.
R: En el estado financiero se está presentando el ‘profit split’ como una canti-dad del efecto neto en los estados financieros.
P: ¿Y a qué obedece eso?
R: A que aquí se presentan ventas y aquí está el estado financiero, el estado de ingresos y gastos completo.
Ledo. Torres: Para fines del registro, perdóneme, cuando dijo: “Aquí se presen-tan ventas”, se refirió al documento sometido al Municipio y cuando dijo la otra explicación se refirió a las notas del estado financiero.” Deposición de la señora Franco, 21 de agosto de 2006, pág. 33.
Esta explicación de que las figuras representaban dos conceptos diferentes se repitió en referencia a cada uno de los años investigados.

 Los documentos se titulaban “Calculation of Taxable Volume of Business per Municipality”. Además, el Municipio también se basó en los estados financieros de Pepsi.

 También surge que Pepsi le sumaba la partida de Interest and Other Income a la de Local Sales para llegar a un total para el Municipio, y luego le restaba una partida llamada 2J Interest Income antes de aplicarle la exención de cincuenta por ciento (50%) en calidad deprofit split.